

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-10-00188-CV

IN THE INTEREST OF J.G.K.,
A CHILD

----------

FROM COUNTY COURT AT LAW NO. 1 OF WICHITA COUNTY

----------

## MEMORANDUM OPINION[1]

----------

### I. INTRODUCTION

Appellant Mother appeals the trial court's judgment terminating her parental rights to her daughter, J.G.K. In four issues, Mother argues that the trial court denied her due process and abused its discretion by denying her pretrial motion to dismiss for due process violations, that the evidence was legally and factually insufficient to support the jury's endangerment findings, and that the

---

[1]*See* Tex. R. App. P. 47.4.

evidence was legally and factually insufficient to support the jury's best interest finding. We will affirm.

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. Mother's Testimony

#### 1. General Background

Mother testified that she was thirty years old at the time of trial and had given birth to six children: J.K.P., J.G.K., T.M.J., D.J.F., T.Q.F., and G.J.M.-B. Mother admitted that she had never been married to any of the fathers of her six children. Of the six children, only G.J.M.-B. lived with Mother at the time of trial. The following recounts Mother's life before children, the birth of her children,[2] CPS's involvement,[3] the living conditions the children experienced, Mother's dependence on CPS and the Court-Appointed Special Advocate Association (CASA), and the instability in Mother's emotional state and living arrangements that persisted throughout the case.

#### 2. Mother's Employment History and Criminal History

In 1999, Mother worked at Whataburger for two days. That was the only job that she had ever held. Mother admitted that she had been charged with

---

[2]We note that Mother struggled to give the correct birth dates for each of her children. The factual background section, as well as our analysis, covers all six of Mother's children because the pediatrician who testified at trial stated that Mother's treatment of one child was relevant to her other children.

[3]We refer to the Texas Department of Family and Protective Services interchangeably as "the Department" and "CPS."

aggravated robbery and that the case had remained pending for approximately two years, but the case was dismissed after DNA testing. Mother said that the dismissal of the case "helped like law wise" but not as far as getting a job or an apartment because the arrest remained on her record.[4] Mother said that she did not have the money to get the arrest expunged from her criminal record.[5]

### 3. Births of the Children and CPS's Involvement

#### a. Mother Gives Birth to J.K.P.

Mother gave birth to J.K.P. in June 1999 and supported herself and J.K.P. by using food stamps and Medicaid. Mother stayed with J.K.P.'s father on Spring Lake Drive. They lived there for two years and then moved to the Housing Authority at 415-D Bailey Street, paying $50 a month for rent. After that, Mother moved in with her mother on Gerald Street.

#### b. Mother Passes Out After Smoking Marijuana

CPS first got involved in Mother's life in May 2002 when she ended up in the hospital after fainting from smoking "weed." At the time, J.K.P., who was

---

[4]Mother told her caseworker that she could not work because of criminal charges in 2007.

[5]The police records admitted at trial were voluminous and included police reports of incidents in which Mother was a suspect and others in which she was a victim. Not all of the police reports were legible, but those that were revealed that Mother was charged with assault, among other things, on multiple occasions, but the charges were not prosecuted. At the time of trial, Mother was supposed to be performing community service for a disorderly conduct charge.

approximately three years old, was Mother's only child. Mother said that CPS talked to her and then dropped the case.

### c. Mother Gives Birth to J.G.K. and T.M.J.

In December 2002, when J.G.K. was born, Mother was staying with her mother, who was helping to support Mother, J.K.P., and J.G.K. The same was true in 2004 when T.M.J. was born.

### d. Mother Gives Birth to D.J.F.

When D.J.F. was born in 2005, Mother lived in "the projects" owned by the Housing Authority until she was evicted.[6] Then, Mother moved in with her mother, later moved to Park Regency, and then moved back with her mother. During 2005, Mother was supported by D.J.F.'s father,[7] J.K.P.'s father, food stamps, Medicaid, and her mother, who was helping her "a lot, too."

### e. Mother Leaves Children with a Mentally Ill Person, and Children Are Removed by CPS

In 2005, Mother left J.K.P., J.G.K., T.M.J., and D.J.F with a lady named Dorothy, whom Mother had known for only a day; Mother later learned that Dorothy had a mental illness. D.J.F. stopped breathing while she was in Dorothy's care, and Dorothy called 911. D.J.F. was taken to the hospital, and CPS thereafter removed the four children and placed them in foster care. Mother

---

[6]Mother was evicted because D.J.F.'s father had been caught visiting at Mother's residence even though he was barred from the Housing Authority.

[7]D.J.F.'s father also fathered T.Q.F.

4

received a family plan that included counseling, drug testing, and parenting classes.

### f.      Mother Calls CPS to Take J.K.P.

J.K.P. was placed with Mother's mother in 2005 and lived with her from then until 2006.  During that time, Mother "was staying just anywhere" because she was homeless.  In 2006, Mother's mother dropped off J.K.P. at Faith City Mission where Mother was staying; Mother's mother said that she was not going to come back to get him.  Mother then called CPS, and CPS placed J.K.P. into foster care.[8]

### g.      Mother Gives Birth to T.Q.F.

When Mother gave birth to T.Q.F. in January 2007, the other children were in foster care.  CPS allowed Mother to keep T.Q.F. with her while she was working her service plan.  At that time, Mother lived at 1202 Austin.  Mother said that she paid for her own place for about four months but that it was a struggle because she did not have a job.  She received child support and used it to pay the rent.

### h.      Mother Uses Cocaine

In March 2007, Mother tested positive for cocaine while three-month-old T.Q.F. was living with her.  CPS thereafter removed T.Q.F. and placed him in

---

[8]Mother's psychological evaluation dated June 19, 2006 reveals that "[t]here have been prior referrals to CPS for medical neglect and for leaving [the children] alone."

foster care. Mother moved back to the mission because the child support payments ended once all of her children were in foster care. CPS offered services to Mother at that time. Mother's service plan included counseling, a psychological evaluation, visitation, and parenting classes, and CPS paid for Mother's services.

### i.    Monitored Return

From June to August 2007, J.G.K. was supposed to be living with Mother because the case involving J.G.K. had been dismissed. According to Mother, however, J.G.K. was not returned to Mother because her caseworker, Tammy Durham, said that it would be unfair to D.J.F. (who was living in the same foster home as J.G.K.) for J.G.K. to be removed.[9]

In August 2007, while Mother was living with her mother at 924 Gerald Street, the children were returned to her under a monitored return plan in which they remained in CPS custody. J.G.K. and D.J.F. were returned first, then J.K.P., and T.Q.F. was returned last.

During the monitored return, Mother did not have a place of her own; she lived on Gerald Street with her mother. Mother described her life during that time as "[h]ectic, chaotic. I didn't really have no money. I wasn't stable. I was homeless, basically." Mother said that Durham knew that Mother was homeless

---

[9]Durham testified that she never told Mother that J.G.K.'s case had been dismissed but that Durham was not going to move J.G.K. because it would be unfair to D.J.F. Durham testified that she actually moved J.G.K. and D.J.F. at the same time and that it had nothing to do with the dismissal of J.G.K.'s case.

before Durham returned the children to Mother.  Mother spent time drifting from one friend's residence to another friend's residence.  Mother said that sometimes she left because she did not like the way things were done at that friend's house and that sometimes she and her children were kicked out by the friend's boyfriend.  During this time, Mother said that she used "general delivery" for her mail and went to the post office to pick it up.

Mother admitted that during the monitored return, her Medicaid lapsed, her food stamps lapsed, she did not have a home, she had no transportation, and her only support was Social Security benefits[10] and occasional gifts of money from family and friends.  Mother recalled that she had asked CPS for food three or four times during the monitored return.

Mother said that CPS should not have returned her children to her because she was unstable and was homeless.  Mother said that she would rate that time when she had her children as a zero for being the worst time period in her life.

### (1)  School Disruptions for J.K.P. During the Monitored Return

While Mother had five of her children living with her, Durham went by Mother's home often to check on her.  The mornings were chaotic even though J.K.P. was the only child going to school.  It was Mother's responsibility to wake

---

[10]The record, however, reveals that Mother did not begin receiving Social Security disability until May 2009.

7

up J.K.P. and get him on the school bus, but she admitted, "I didn't do very well." Mother said that Durham ended up taking J.K.P. to school "[a] lot."

Mother recalled that J.K.P. missed about twenty days of school while he was in her care for six months, and she knew that he was having problems in school before he missed all that time. Mother had no reason to doubt the school records if they showed that J.K.P. had missed thirty-six days of school in spring 2008. Mother testified that J.K.P. went to "about five different schools" from August 2007 to March 2008; Mother was surprised to hear that J.K.P. had actually attended nine schools. Mother also admitted that she did not do very well with the other four children during the monitored return.

### (2) Various Moves During the Monitored Return

As a condition of the monitored return, Mother agreed to stay with her mother at 924 Gerald Street. Mother stayed at 924 Gerald Street for about three or four months and then moved to First Step, which is a battered women's/family violence-type shelter, before Christmas because she and her brother got into an argument. Mother could not recall whether she told Durham about moving to First Step before or after she moved.

Mother stayed at First Step for a couple of weeks until she was asked to leave because she was not following the rules. Mother moved from First Step to 506 Dallas Street to live with a friend named Shandreka. Mother could not recall whether she told Durham about moving to 506 Dallas Street before or after she moved. When Mother moved to 506 Dallas Street, Durham went with Mother

8

back to 924 Gerald Street to help Mother get her children's belongings, and Mother's mother hit Mother. Mother's brother also threatened Mother. Durham helped Mother get out as fast as she could, and Mother called the police.

Mother stayed at 506 Dallas Street until after New Year's 2008, and then for two months, she started moving back and forth between 506 Dallas Street and a new address on Gerald Street that she shared with G.J.M.-B.'s father. Mother admitted that she did not call Durham to let her know that she was moving back and forth every time she moved; instead, Durham had to look for Mother. While Mother was going back and forth between the new address on Gerald Street and 506 Dallas Street, there was a time when Mother refused to tell Durham where she and her four children were living, but Mother took them to the CPS office. During that time, Mother was staying with her cousin Latoya, G.J.M.-B.'s uncle, and Latoya's two children. Mother did not stay with her cousin for long because Durham threatened to remove the children if Mother did not tell her where she was living.[11]

---

[11]Mother said that she had to respect her cousin's wishes to not tell the Department where she was staying. Mother was cross-examined about her statement that she would do anything for her children but yet she had listened to her cousin instead of following the trial court's rules, which included telling CPS where she was living. She said that is when Durham told her to go back to 506 Dallas Street, and Mother complied.

9

### (3)  T.Q.F. Gets Sick in Mother's Care

In February 2008, Mother took T.Q.F. to the hospital where he was diagnosed with RSV, pneumonia, and an ear infection. Mother did not have Medicaid or food stamps because she had let them lapse around October 2007.

### (4)  Mother Continues Relocating

After Mother took T.Q.F. to the hospital in February 2008, Mother moved in with a friend named Ta'Niel who lived on Britain Street. Mother admitted that she did not call Durham prior to moving to Britain Street.

After a week at Britain Street, Ta'Niel moved to 205 Cleveland Street in March 2008, and Mother moved with her. Mother said that it was Ta'Niel's idea to move to Cleveland Street;[12] Ta'Niel rented a house, and Mother moved in with her.[13] Mother did not inform Durham prior to the move.[14]

---

[12]Mother said that she did not know that Ta'Niel was moving until the last minute and that Ta'Niel moved because Durham told her that she needed a bigger house. Durham testified that she did not tell Ta'Niel that she needed a bigger house.

[13]Mother said that she did not contribute to the household; she did not buy groceries or pay the bills.

[14]At one point, Mother listed the following as places she had lived: the Housing Authority, Park Regency, Marconi, Sun Valley Apartments, Dallas Street, First Step, Gerald Street, Britain Street, Cleveland Street, Juarez House, Faith City Mission, and 1919 8th Street. Mother thought that she had told CPS twice in advance before a move. Mother admitted that she did not always notify Durham before she moved but that she should have. Mother, however, stated that throughout the monitored return, Durham always knew where Mother was living. When asked how that was consistent with a willingness to do anything that it took to get her children back, Mother said,

### (5) Dangerous Conditions at 205 Cleveland Street

The Cleveland Street apartment had two bedrooms; Mother and her five children were in one bedroom, and Ta'Niel and her boyfriend lived in the other bedroom. Pictures of the kitchen revealed a cabinet door that was broken off underneath the counter and a broken counter edge that was dangling. After Mother moved in, Durham came by and told her that the house needed to be cleaned up quickly. Durham pointed out to Mother that there were rat feces in the house, as well as boards with exposed nails on them, which posed a danger to children. Mother said that the pictures that were admitted into evidence showed the worst areas of the house, indicating that they did not accurately reflect the whole house. Even so, Mother agreed that the house was dangerous, but she testified that she had nowhere else to go.

---

I've shown numerous of times. I done did everything y'all wanted me to do, done came to every court hearing. Even the ones that I wasn't supposed to come to, I'm here for my kids. So what more do y'all want from me? What, what -- I mean what else can I do? If I got a job making $25 an hour and got a six-bedroom house, that still wouldn't be good enough for y'all. Because y'all want my kids. Y'all want to adopt my kids out. So anything I do, it'll never be good enough for y'all, period point blank. [CASA worker] Mauri done made that clear. Linda done made that clear. [CPS worker] Kristi Row done made that clear. Y'all done made that perfectly clear. And I will continue to appeal and appeal and appeal until I get my kids back. I'm going to fight y'all to the end. I'm not going to give up just like that. So y'all can sit up there and y'all can – [the trial court interrupted Mother and instructed her not to give a narrative.].

### j.    CPS Removes Children Again

On March 5, 2008, CPS removed all five of Mother's children; G.J.M.-B. had not been born at that time.  Mother said that CPS stepped in because she could not take care of her children.  Mother recalled that J.G.K. had two ringworms when she was removed.[15]  Additionally, T.Q.F. was not current on his vaccinations.  Mother admitted that she had not sought medical treatment for J.G.K. or vaccines for T.Q.F. because her Medicaid had lapsed.  Mother denied that the children were dirty when they were removed.

Between the time that Durham initially saw the house on March 4, 2008 and the time Mother's children were removed on March 5, 2008, Mother had cleaned the house a little but had not cleaned up everything that CPS had requested in the limited time she was given.  Mother admitted that the house was unsafe in its condition but said that it could have been made safe if she had been given ample time to clean it.

Mother initially did not recall whether the police came during the removal.  After a lunch break during the trial, however, Mother recalled testifying in September 2009 that Durham, Valerie Soto with CASA, investigator Samantha Li, and the police were present for the March 2008 removal.  Mother said that she did not threaten Durham, but Mother recalled telling Durham that if she came and took Mother's children, there was going to be trouble.  Mother admitted that

---

[15]Dr. Hollis said that it constitutes medical neglect when a parent has a child with two ringworms and does not take the child to get medical treatment.

her threat could explain why the police came with Durham. On the date of the removal, Mother did not recall anyone threatening to shoot the CPS workers if they came inside the house to remove the children. Mother said that it was a lie if someone testified that a threat had been made to shoot anyone who came in and took the children; no one was arrested for making a threat.

After CPS took custody again of all of Mother's children, except G.J.M.-B. who had not been born, a new case was filed on J.G.K.

### k. T.Q.F.'s Failure-to-Thrive Diagnosis

The day after the removal, T.Q.F.'s foster family took him to Dr. Hollis, a pediatrician, who diagnosed T.Q.F. with failure to thrive. Mother testified that she had noticed that T.Q.F. was not growing from age eight months to thirteen months, but she never took him to the hospital. When Mother eventually took T.Q.F. to the hospital for RSV and bronchitis, the hospital told her that T.Q.F. had lost weight because he had been sick; Mother said that she did not know why the hospital did not put that in the medical records. Mother said that her story about T.Q.F.'s losing weight from being sick and her story that she had noticed that he was not getting bigger are both true. However, Mother admitted that her inaction in seeking treatment for T.Q.F.'s failure to grow had endangered him and that it was "real irresponsible."

### l. Mother Moves to Faith City Mission

After Mother's five children were removed, the trial court ordered that Mother receive a service plan, but she did not receive one until October 2008. At

13

that time in October 2008, Mother was living at Faith City Mission and was pregnant with G.J.M.-B. Johnson went over the service plan with Mother, and Mother said that she understood everything on the plan.

**m. Mother Gives Birth to G.J.M.-B.**

In November 2008, Mother gave birth to G.J.M.-B. while Mother was living at Faith City Mission and all of her children were in CPS care. Mother said that she stayed at Faith City Mission for almost a year and was very grateful for their help.

After G.J.M.-B. was born, Patrick Barber and someone else with CPS came to the hospital, and Mother said that they thought she was going to hand over G.J.M.-B. But Mother begged to keep her baby and was allowed to go back to the mission and to take G.J.M.-B. with her.

Mother stayed in a family room with G.J.M.-B. Faith City Mission provided Mother with everything for her and G.J.M.-B. Mother had chores to do at the mission. The mission told her about the Christian Women's Job Corps (CWJC), and Mother took classes through that organization. The CWJC provided childcare for G.J.M.-B. while Mother took classes. Mother, as required, stayed current on her Medicaid while she was at the mission.

While Mother and G.J.M.-B. were at the mission, Barber stopped by to check on Mother's accommodations and to watch her interact with the baby. Thereafter, the trial court held a hearing involving a nonemergency removal of G.J.M.-B., and it gave custody to the Department but allowed G.J.M.-B. to stay

14

with Mother. The orders stated that G.J.M.-B. would stay with Mother for 180 days.

The trial court approved Mother's stay at the mission because the mission was providing Mother with everything she needed. Mother recalled that Judge Bondurant, the associate judge who oversaw Mother's case, had instructed her not to move out of the mission into another home with G.J.M.-B., until Joe Steimel the ad litem, Mauri Reed, and Judge Bondurant approved the move.

Prior to May 2009, the trial court ordered Mother to apply for Social Security, and she was awarded Social Security benefits in May 2009 and received a lump sum check for over $2,000.[16] Judge Bondurant ordered Mother to go to the Housing Authority and try to get unbarred.[17] CASA and Linda Johnson went with Mother and helped her get unbarred, and then they discovered that Mother owed approximately $100 before she could get in. The people at the mission told Mother to save the $2,000 lump sum payment that she had received from Social Security and to use it to get into the Housing Authority, which would have charged her only one hundred to two hundred dollars for rent.

---

[16]When Mother later received a $1,000 check from Social Security, she used $900 of it to buy clothes and Christmas gifts for her children. Mother thereafter started receiving $675 per month.

[17]Presumably, Mother was barred from the Housing Authority due to the prior eviction for allowing a "barred" person, D.J.F.'s father, to visit her while she lived at the Housing Authority.

15

Instead, Mother used the $2,000 to rent a place to live, to buy furniture, and to purchase G.J.M.-B. "some summer clothes and stuff."[18]

### n. Mother's Living Arrangements After the Mission and G.J.M.-B.'s Temporary Removal

Mother admitted that she had failed to notify anyone prior to moving from the mission to an apartment at 1919 8th Street. According to Mother, there was a hearing the week that she moved from the mission, and everyone was aware that Mother was moving. However, after Mother moved and CPS saw that Mother was no longer at the mission, Judge Bondurant ordered G.J.M.-B. removed from Mother's care while the house was being checked out by CPS. After the house was inspected, Judge Bondurant allowed G.J.M.-B. to stay with Mother and dismissed the case. That was the only time—approximately a week and a half—that G.J.M.-B. was not with Mother.

### 4. CPS's Visits to Mother's Apartment

Mother said that all of the children with pending cases were in foster care, so she did not understand why the Department had to come check on her. Mother said that she thought she was supposed to call and check in; she did not

---

[18]Mother had until the end of August 2009 to complete her requirements to get into the Housing Authority, or she would be moved to the bottom of the list and have to restart the application process. At one point prior to admitting that she had done nothing to get back on the Housing Authority list, Mother testified that she had asked CASA and/or CPS for the money to pay off her outstanding balance at the Housing Authority and was denied, so her landlady allowed her to "short her." But Mother continued living at 1919 8th Street and was not considering moving to the Housing Authority at the time of the termination trial.

know that she was supposed to tell them where she was. So Mother believed that it was an invasion of her privacy when CASA came to check on her, knocked on her windows, and looked through her windows. Mother said that she answered the door when she was home and that neighbors had told her about CPS's knocking on her windows and looking into her house. Mother later admitted that there was one time when she was at the 8th Street apartment when she was home but did not answer the door. Although that occurred when the Department had custody of G.J.M.-B., Mother said that CPS did not have the right to look in her windows. Mother believed that they were just looking for something to use against her in court.

### 5. Mother's Service Plan

Mother's service plan required her to obtain stable housing and stable income. She was required to attend parenting classes and counseling and to obtain a legal source of income. Mother took parenting classes and did her counseling through CWJC, and she obtained Social Security income. As discussed in more detail below, Mother was required to prepare a written budget, and she prepared budgets showing how she would handle her finances if each of the six children were returned to her.

Mother was also required to exercise patience with her children during her visits; she admitted that there had been times in the past when she had been impatient with her children. Mother felt that she had progressed in that area "[a] whole lot."

17

Mother's service plan also required her to remain drug free, and she testified that she had done so, that she had never tested positive on a drug test, and that drugs were not an issue for her.[19] Mother said that she did not drink alcohol and that it had been years since she had used a nonprescription drug.

Mother obtained a clean home and allowed CPS to visit. Mother was required to be honest with CPS, and she had progressed in that, only failing to tell Durham when she had moved.

### 6. Mother's Budgets

The budgets that Mother was required to prepare were admitted into evidence. Mother marked $0 for every category on the budget that she prepared when she was living at the mission from September 2008 to May 2009 because the mission provided her with everything.

After Mother moved out of the mission, Mother paid $500 per month for rent. With her other expenses, Mother spent $779 per month total.[20] Mother explained that T.M.J.'s father gave her the $104 per month that exceeded her

---

[19]Mother's landlady testified that Mother had a sign on her door that said, "Do not come knocking on my door for drugs."

[20]Mother admitted that she smoked three or four cigarettes a day but said that she did not pay for them; if she asked someone for a cigarette and he/she did not give her one, she did not need one.

Social Security check.[21]   However, T.M.J.'s father was in jail prior to February 2010 and went back to jail the week of Mother's termination trial.[22]

Mother admitted that she was also paying $130 per month on tickets for disorderly conduct.[23]   Including her tickets, Mother's monthly expenses totaled $909.   Mother said that she was "shorting" her landlady to pay her other bills. Mother paid only $300 of her rent in April 2010.   Mother explained that she had paid only $200 for rent the month of the trial (May 2010) because her landlady had not fixed what Mother wanted her to fix.

---

[21]Mother said that T.M.J.'s father was bipolar and was "kind of slow."  She said that he received a monthly Social Security disability benefits check.

[22]T.M.J.'s father was arrested May 10, 2010.  Mother testified that he was in jail for violating his probation on an assault family violence charge.  Mother admitted that T.M.J.'s father stayed the night occasionally and would sometimes stay for a week, but she later testified that he did not stay with her.

At some point, T.M.J.'s father was in a court-ordered lockdown drug rehab facility a/k/a Substance Abuse Felony Punishment facility.  T.M.J.'s father was released in February 2010 and was supposed to report to a halfway house but failed to do so.  Mother said that he was taken to jail the week of the trial because he had not done community service hours and had not paid his probation fees.

Mother said that while T.M.J.'s father was in jail, she was making her car payments herself.

[23]Mother was ordered to perform community service on her disorderly conduct charge, but she had not completed her community service.  Mother said that she was aware that her disorderly conduct case had gone into "active warrant stage" and that was when she made an appointment and received a payment plan.  She testified that she no longer had a warrant.

19

Mother said that her cousin Darissa had given her less than a hundred dollars. Mother also said that her mother had given her forty or fifty dollars since January 2010.

### 7. Mother's Car

Mother said that she did not have transportation until she bought a car in January 2010. Mother testified at trial that she had been paying $140 per month for her car for approximately five months. Mother had no driver's license and no insurance and admitted that she would go to jail if she did not make payments on her tickets. Mother had paid $350 for her car; she was continuing to pay $140 per month.

Mother still did not have car insurance or a driver's license at the time of trial. She said that she was working on those items and had been working on them for "a while" but that it was a process because she needed to pay off four tickets and to obtain a required form. Mother admitted at trial that she could be stopped at any time and given another ticket for having no driver's license and no car insurance. Mother knew that driving without a license and without insurance is a crime; she had thought about the possibility that she could go to jail for driving without a license and car insurance, and that was why she did not drive every day.

Mother said that G.J.M.-B. rides with her when she drives her car. Mother said that if her children were returned to her that she would not drive without a license and car insurance. But Mother also said that if her baby needs to "go

20

somewhere, I'm gonna take her where she need[s] to go." Mother admitted that her actions were not responsible.

Mother realized during cross-examination at trial that she could have put the money that T.M.J.'s father had given her toward car insurance or a driver's license or toward hiring an attorney to have the aggravated robbery expunged from her criminal record. She admitted that the way she had spent her money was not a good example of stability and responsibility. Mother also admitted that she had received a $500 income tax refund and that she could have put that toward car insurance, a driver's license, or expunging the aggravated robbery from her criminal record. Instead, Mother had used the money from T.M.J.'s father and the $500 tax refund to buy a car, to buy "stuff" for G.J.M.-B., and to pay the phone bill. She noted that she did not spend any money on herself.

### 8. Mother's Living Arrangements at the Time of Trial

At the time of the trial, Mother was still living at 1919 8th Street, and she had been living there for almost a year. In August or September 2009, Johnson came by Mother's apartment and took pictures. Mother testified that her cabinets of food were fuller at the time of the termination trial than they were when the pictures were taken.

Mother turned in her landlady to code enforcement for code violations shortly before the trial because Mother had a very difficult time getting her landlady to make repairs. As noted above, Mother had "shorted" her landlady for

21

not properly fixing items that Mother had requested.[24]  For instance, Mother had a hole in her bedroom wall, and the landlady put paste over it; the landlady had cut a hole in the kitchen floor and put plywood over it and nailed it down; the faucets in the kitchen were outdoor faucets; the bathtub faucet ran constantly and the bathtub was rusted; the living room closet door had fallen off its hinges, as had the cabinet door in the bathroom; and the landlady had not sprayed for roaches.  Mother said that every other month, the gas, the lights, or the water were being cut off, even though her rent included "all bills paid"; Mother found out that the landlady had not been paying the utility bills.  Mother admitted that she had not paid the full amount of rent for approximately four months and that an eviction proceeding was pending.

Mother said that her lease would expire at the end of June and that she was not planning to stay at that apartment.  Mother had looked at an apartment near the air force base for $410 per month, all bills paid; the landlady at that apartment had said that she would work with Mother regarding the deposit. Mother had also looked at an apartment on Austin Street for $325 per month that included only water; the deposit was $100 and would require Mother to pay for electricity.  Mother said that she would let CPS know as soon as she decided where she would be moving.

---

[24]Mother did not realize that her lease required her to request in writing that repairs be made; she admitted that she had not complied with that provision. Mother also did not know that her lease required her to make all repairs that cost less than $50.

### 9. People Who Lived with Mother

Mother admitted that her children had witnessed acts of family violence in the past. Mother said that her brother Prentice had stayed with her sometimes but was not living with her at the time of the termination trial. Mother's brother sometimes spent the night with her at least one night a week. Mother admitted that her brother had threatened her, but she stated that "he would never do nothing to me."[25] Mother denied telling her landlady that her brother had given her a black eye. However, there was evidence that Mother's brother had beaten up his girlfriend, and Mother agreed that a person who beats up his girlfriend is not a good person to have around children and that having that type of person around could endanger a child.

Mother testified that she was not in a relationship at the time of the trial. Mother admitted that T.M.J.'s father had come to her house and that she had sex with him from time to time. T.M.J.'s father beat her, and she had requested that a protective order be issued against him in 2005. Mother said that T.M.J.'s father smoked marijuana but not at her house because she does not allow it. Mother agreed that it was not a good thing to have children around someone who does drugs because that could endanger the children.

---

[25]Copies of judgments that related to Prentice's convictions for evading arrest and theft were admitted into evidence at trial.

### 10. Mother's Support at the Time of Trial

Mother understood that she would not receive child support if J.G.K.'s father's parental rights were terminated. Mother was not on WIC at the time of the termination trial because she said that "[t]he same thing I get on WIC, I can get on food stamps." Mother later admitted that WIC would give her more than her $365 for food stamps because WIC would allow her a three-month supply of groceries. Mother admitted that she had let her food stamps lapse in the past but said that she currently had food stamps and was on Medicaid at the time of the termination trial. Mother said that she would receive $150 more in food stamps but no increase in Social Security.

### 11. Concrete Services Provided to Mother

When asked if CPS gave Mother a second chance by giving her a service plan to work after removing her fifth child, Mother said that CPS gave her "[h]eartache and pain." Mother said that she did not ask CPS to do anything for her except once when she needed approximately $100 to pay the Housing Authority, but she ended up taking care of it herself because CPS would not give her the money. However, Mother admitted that CPS had paid for all of her services until she went to the CWJC, at which time she was able to work her parenting classes while she was there.

Mother told CPS and CASA that she did not have food and clothing for her children, and CPS and CASA went and purchased food and clothing for her children. CPS provided a lot of food when Mother let her food stamps lapse

24

while she had her five children from August 2007 to March 2008. Mother also received sleeping bags, school uniforms, and school supplies, but Mother said that she did not ask for those items. Mother had called and asked Durham to take J.K.P. to school, and Durham complied and gave him rides multiple times. CPS gave Mother bus passes after they decided to no longer transport her because she had threatened CPS following the removal of the children. Mother admitted that she was thankful for the mental help, the bus passes, and the food that CPS had given her.

### 12. Visits with Children

Mother's weekly visits with her children at the CPS visitation center lasted an hour. Mother said that she regularly visited her children unless she was sick.

Mother said that she was "very, very, very upset" at the visit in April 2009 when she slammed and broke the door at the visitation center because she wanted to know why J.G.K., who was in foster care, had scratches on her cheek, but Durham told her that she would not call to get an explanation from the foster parents. Mother said that she was on her medications at the time of that outburst.

Mother testified that G.J.M.-B. was a very healthy child who only got sick with colds but said that she had battled diarrhea in February 2010. Mother called and cancelled her visit on February 4, 2010, because G.J.M.-B. was ill. Mother had called the doctor, but she had not taken G.J.M.-B. in to the doctor's office.

Mother's visit on February 11, 2010, was cancelled due to snow. Mother called and cancelled her February 18, 2010 visit because G.J.M.-B. had a cold.

On February 25, 2010, Mother called CPS less than two hours before her visit to tell them that she was in Lawton with a friend named Kanesha and would not make her visit. Mother admitted that on the last Thursday of February, after not having seen J.G.K. all month, Mother had chosen to go out of town with a friend on a day when she knew she had a visit scheduled. Mother said that she had chosen to go shopping in Lawton instead of visiting with her children "[t]o just get away. . . . out from all of this drama."

Mother visited her children on March 4, 11, 18, and 25 and on April 1 and 8.

Mother called on April 15 and cancelled her visit because she was sick. On April 22, 2010, Mother was ten minutes late because she was ill with a sinus infection. On April 29, 2010, Mother called and cancelled because she was still sick with a sinus infection. Mother said that she had gone to the doctor but had not been able to get her prescription.

On May 6, 2010, Mother cancelled her visit due to a "head cold." On May 13, 2010, the Department allowed Mother a two-hour visit to make up for previous missed visits, but Mother left an hour early because she was sick.

### 13. Mental Health

Mother admitted that CPS had been in her life for a long time and that she had become "pretty suspicious" of CPS during the "last several years" preceding

the termination trial.  Mother was diagnosed with bipolar disorder and depression in 2006 when she underwent a psychological evaluation through CPS.[26]  Mother admitted that she had a mental illness and that was the reason she received Social Security benefits.  Mother testified that she went to Helen Farabee Regional MHMR Center for medication and treatment.[27]  Mother had undergone several psychological exams and said that she had been on medication for bipolar disorder and depression for approximately two years.  She said that her medications had been changed three times during the last year and that there were some side effects including dizziness, sleepiness, and diarrhea.  Mother said that she took her medications as prescribed every day and that her medications worked "extremely good" for her and helped to keep her calm.

As part of her service plan, Mother saw Dr. Sabine for the psychological evaluation.  After the psychological evaluation, Mother started seeing Dr. Salkeld, but Mother no-showed enough times that the Department would no longer pay

---

[26]During the psychological evaluation, Mother admitted that she had previously been in the state hospital for one day after she had tried to cut her wrist following a family conflict.  The notes from her psychiatric evaluation state that Mother took an overdose of some pills "in a suicide gesture" during her early teenage years but did not go to the hospital because she felt fine after she vomited.

[27]The records from Helen Farabee reveal that Mother "no-showed" for approximately ten appointments from 2008 to 2009 and that she still felt depressed on a daily basis as of March 17, 2010, and would sleep all day, getting up only to feed G.J.M.-B.

for Dr. Salkeld's services.[28]  Mother had been told in April 2010 that she could use Medicaid to continue Dr. Salkeld's services, but as of the time of trial, Mother had not made arrangements for that and was not sure who she wanted to seek treatment from.  She said that she was "looking into it."

### 14.  Mother's Anger Issues

In addition to her mental health medications, Mother attended classes in 2002 and 2003 to deal with anger.  Mother said that the Department never talked to her about her yelling and screaming at her children.

Mother said that the day she met Johnson, Mother had been in a screaming match with Durham and another CPS worker named Kristi Row because J.G.K. had a scratch on her face and Mother wanted to know what had happened to her.  Mother slammed and broke a door at the visitation center.

Mother admitted that she had gotten into arguments and yelling matches with CPS over her children.[29]  Mother yelled or hung up on Johnson numerous times after she became Mother's caseworker.  When the Department refused to give Mother money to pay her outstanding balance at the Housing Authority,

---

[28]Mother testified that she understood the Department's no-show, no-call policy, which allowed the Department to stop paying for Mother's services and to require Mother to pay for them if she missed a certain number of meetings.  At trial, the Department admitted records from Family Circle Services, which show that Mother often no-showed for her parenting classes during the 2007 to 2008 period.

[29]The notes from Mother's 2009 psychological evaluation state that Mother "has episodes of exploding in anger and has done so when her children are in the room."

28

Mother said that she did not yell but told Johnson, "[Y]'all help everybody else, people that's on drugs can get some help. But a parent that's trying to do something and love their child and try to get their kids back, y'all don't ever want to help them or do nothing for them."

### 15. G.J.M.-B.'s Life

At the time of the termination trial, G.J.M.-B. was current on her vaccinations, and her Medicaid was current and had never lapsed. Mother said that CPS never told her that she was not doing a good job with G.J.M.-B.; CPS always told her that G.J.M.-B. was getting so big and that she was so pretty. Mother said that G.J.M.-B., who was one year old at the time of the termination trial, was very friendly, liked to talk to people, was very loving, gave hugs and kisses, liked to learn new things, and loved her Betty Boop doll.

Mother agreed that it was her sole responsibility to take care of her children. Mother said that she had not asked anyone for help with G.J.M.-B. and that anyone who had helped her had helped because they wanted to. Mother said that she never called the foster families and asked for help; the foster families called her.

### 16. Other Children's Lives

Mother testified that J.K.P., who was ten at the time of the trial, had a bad attitude sometimes, but overall, he was lovable, understanding, and a good kid who did his best to please people.

Mother said that T.M.J., who was five at the time of the trial, had a very motherly instinct, was very sweet, loved school, was a very good kid, was always happy, but did not like to be teased.

Mother said that D.J.F., who was four at the time of the trial, was no-nonsense and told people her feelings, was a very sweet kid, and loved her sisters and her brothers. Mother admitted that it had been a long time since D.J.F. had sat through an entire visit with Mother without leaving early.

Mother did not know anything about T.Q.F., who was three at the time of the termination trial, because he had been in CPS custody since he was three or four months old. At the time of the trial, Mother testified that her case involving T.Q.F. was on appeal and that she hoped to get him back.[30]

Mother agreed that D.J.F., T.M.J., and J.K.P. were "all in the same spot" because CPS had been appointed permanent managing conservatorship, but it was Mother's hope that she could go back to court and get them. She said that hope is what led her to turn her life around. She testified, "[M]y kids is my world. They are more important to me than anything. I love my kids. I'm going to fight, going to keep on fighting. I'm not going to stop fighting." Mother said that she loves all of her children equally and that no one has ever accused her of hitting her children or of letting them be sexually abused.

---

[30]The termination of Mother's parental rights to T.Q.F. was affirmed in *In re T.T.F.*, 331 S.W.3d 461, 489 (Tex. App.—Fort Worth 2010, no pet.). It is unknown why the initials are different, but the appeal dealt with T.Q.F.

### 17. J.G.K.'s Life

Mother testified that J.G.K., who was seven at the time of the trial, was a people pleaser, was lovable, was very helpful, had a motherly instinct, had always been happy, and was a very good kid. Mother admitted that J.G.K. had been in foster care most of her life. Mother did not believe the foster family that J.G.K. was living with was a loving, stable, safe environment based on what J.G.K. had told her.

### 18. Mother's Plans for J.G.K.

Mother explained,

> I would really like a second chance with my daughter.[31] I feel that they gave me my kids back at a time when I wasn't ready. Now, I'm more stable. I have money that I can take care of my -- my kids now. And I would really like for y'all to return my daughter to me.

Mother testified that her mother, her cousin Darissa, and her sister Toi had watched G.J.M.-B. for her and that these same people would help her take care of J.G.K.

Mother did not have a bed for J.G.K. at the time of the termination trial but said that she would obtain a bed for J.G.K. if she was returned to Mother; Mother said that the mission "give[s] away stuff every day, all day." However, Mother admitted that she had not checked into getting J.G.K. a bed from the mission.

---

[31]Mother testified that her children had been removed, placed back, and then removed again, but Mother did not think that she had already received a second chance. She did not know how many chances she should receive at the detriment of her children.

31

Mother said that she could get clothes for J.G.K. from the mission and that she could buy some as well; Mother said that she would use some of her Social Security check to buy the clothes and would not "short" anyone, but she did not explain how her $675 would cover her $909 of bills, plus buy additional items for J.G.K. Mother testified that she would be able to care for J.G.K. in addition to G.J.M.-B. because she was moving to a cheaper house.[32] She said that she would "make it and continue not to ask CPS or nobody for nothing."

Mother did not know where J.G.K. would go to school if she was returned to Mother; Mother said that she would send J.G.K. wherever the school district told Mother to send J.G.K. Mother admitted that she had a "bad history of getting [J.K.P.] to school." Mother said that she was more stable now and not moving from place to place. She said that she was irresponsible back then but that she is more responsible now. She said, "I had a lot of growing up to do" but that she had grown up a lot. Mother was asked how getting evicted, shorting her landlord, and driving a car without insurance and without a license—when she could have spent money to obtain those things—made her stable at the time of the trial; she admitted that was irresponsible. Mother admitted that her children had paid for her irresponsible behavior more than she had.

---

[32]As set forth above, one apartment that Mother was looking at rented for $325 per month and did not include utilities and another apartment rented for $410 and included utilities, as compared to the $500 per month that Mother was paying for her apartment at the time of the termination trial.

32

When Mother's counsel told her that the trial court could terminate her parental rights, she responded, "Oh, please don't do that. I love my kids. I'm not perfect. And I'm entitled to make mistakes. Please don't do that." Mother asked that J.G.K. be returned to her.

### 19. Mother's Admissions

Mother admitted that some of her testimony at the current trial was not the same as what she had given at the previous trial. Mother testified in the previous trial that she appreciated the help that CPS had given her and that if not for their help, it "probably would have taken longer" to get back on her feet. Mother admitted that she had lied when she had testified at a previous hearing that the mission had given her a bed, a bassinet, strollers, and clothes to keep forever. Mother admitted that she had lied to the trial court at a previous hearing when she said that she had not moved out of the mission after the Department presented evidence that she had moved out of the mission because she was spending the night at an apartment.

Mother admitted that she had lied in the previous trial and that "progressing in telling the truth" meant that she was not telling the truth all the time. However, Mother said that the jury should believe her now because she did not have anything to hide. Mother said that she had lied in the previous trial because she did not want Durham to get fired from her job.

33

## B.    Durham's Testimony

Tammy Durham took over Mother's case from Brenda Moore, who was Mother's first caseworker.  Durham monitored Mother's progress on the service plan that Moore had given Mother.

Prior to Durham's returning the children to Mother in August 2007, Mother kept telling her that she was ready to take care of her children, and she was doing everything that Durham had asked her to do and had good support.  Because Mother was deemed at least minimally compliant with her service plan, the Department asked the trial court to do a monitored return.

In October 2007, while Mother had the children under the monitored return, Durham was not aware that Mother did not have her food stamps or her Medicaid up to date, which would have been a violation of a monitored return.  Durham learned that Mother's Medicaid was not up to date when CPS received a referral regarding T.Q.F.'s hospitalization in February 2008.[33]  Durham admitted that she had "mess[ed] up" another time in October 2007 because Mother had a positive drug test; however, Durham did not learn of the results until two weeks later because the system for reporting the results had changed.  At that point, Durham felt the time had passed for removing the children based on that drug test.  Mother denied using drugs, an investigation followed, and Mother signed a safety plan stating that she would not use drugs.  According to Durham, another

---

[33]Mother never said that it was her fault that her Medicaid and her food stamps lapsed.

34

mistake was made when the DA's office in Wichita County failed to file for an extension of the one-year mandatory dismissal in J.G.K.'s case, and it was dismissed. From August 2007 to March 2008, the Department had no relationship with J.G.K.

When the children were returned to Mother under a monitored return, Durham told Mother that she was not to move the children without telling Durham or someone from CPS in advance. Although Mother said that she understood that requirement, she violated it numerous times; Mother failed to give notice of every move, except that she did call the day she moved to the Cleveland Street apartment. Durham did not expect Mother to tell her that she was moving to First Step because it was an emergency shelter, but Durham expected Mother to tell her in advance of the other moves. Every time Mother moved, Durham reminded her that she was supposed to give Durham notice before she moved. Durham testified that it was wrong of Mother to keep moving with the children, who were in the Department's care, and not notify Durham.

During the monitored return from August 2007 to March 2008, Durham talked to Mother almost every day and visited with her face to face at least once a week, even though Mother was drifting from place to place living with other people. When Durham visited Mother's home while the children were living there, Durham heard Mother yelling and screaming at the children. Durham tried to talk to Mother about her yelling, but Mother would not talk about it. During that time, Durham felt that Mother was in a desperate situation, and Durham asked to

35

remove the children based on her visits with Mother and her unstable housing. The Department told her that the situation was not egregious enough; Durham disagreed.

Durham said that for two months beginning in January 2008, Mother moved back and forth between Gerald Street and Dallas Street five to ten times;[34] each time, Durham did not know that Mother had moved until she went to look for her. Durham said that it was initially permissible for Mother to stay with her mother because she had kept J.K.P. in the past. Mother's mother was willing to allow Mother and all five of the children to stay with her for as long as it took for Mother to get a house. But Durham was present when Mother's mother hit her. At that point, it was not a good idea for Mother to move back to 924 Gerald Street, so she moved to Dallas Street.[35]

During the monitored return, Mother's household was chaotic. Durham testified that Mother took the children with her every time that she moved back and forth between Dallas Street and Gerald Street and that the two houses were not in the same school district, so J.K.P. had to change schools. Many times

---

[34]Durham said that Mother moved back and forth from Dallas Street to the other Gerald Street because the Gerald Street house was G.J.M.-B.'s father's house; Mother left after they fought and returned when they made up. Durham said that G.J.M.-B.'s father's criminal history check came back clean.

[35]Durham testified that the home at 924 Gerald Street was acceptable and that the Dallas Street home was habitable in the beginning but then deteriorated. The home on Britain Street was "very clean" and "really good," so they asked Mother not to go back to Dallas Street.

36

when Durham showed up at Mother's house in the mornings, J.K.P. was still there instead of in school, so Durham took J.K.P. to school. Often, Mother called and asked Durham if she could come and give J.K.P. a ride to school. Around Christmas, J.K.P. was out of school when he was supposed to be in school, and Mother told Durham that "all he was missing was his party." However, Mother had not even enrolled him in school at that time. Durham said that Mother did not take responsibility for J.K.P.'s missing school.

Before Mother moved to Britain Street, she talked to Durham about moving to Texarkana and taking her children with her. Durham explained that Mother could not move out of state.

Durham said that Mother asked for food several times during her visits to Mother's residences, but most of the time, she called to ask CPS to bring food. Mother told Durham that she was running out of food because the people who were in and out of her house were eating her food. Durham told Mother to tell them not to eat her food, and then Durham brought Mother more food. Durham told Mother that she needed to be sufficient on her own and not depend on the Department for rides, food, diapers, and formula, but Mother told her that she expected CPS to provide all those things for her. CPS provided all those items— plus sleeping bags, a playpen, clothing, and school uniforms—while Durham was Mother's caseworker. Durham said that CASA provided a bed to Mother. Durham said that Mother asked for those items; CPS did not just give them to her. Durham said that the only thing that Mother demanded that CPS refused to

37

provide was transportation after Mother threatened them following the removal; however, CPS provided Mother with a bus pass.[36]

In February 2008, there was a new referral, and Durham got involved in the investigation because of her knowledge of the case. T.Q.F. had been admitted to the hospital for pneumonia and RSV, but Mother had no way to get his prescriptions filled because she did not have Medicaid. The referral was made because T.Q.F. could not be released from the hospital without his medicine. Mother contacted CASA, asking for help with T.Q.F.'s prescriptions.

Durham had a phone conversation with Mother in March 2008 in which Durham explained that the doctor had diagnosed T.Q.F. as failure to thrive, which meant that he was malnourished. Mother started screaming at Durham, "You're saying I'm not taking care of my kids," and she told Durham in a threatening manner that she would pay. At one point, Mother threatened "to come up and whoop" Durham, and that is when the Department decided that it would no longer transport Mother but would instead provide a bus pass. Mother later apologized to Durham for the threats she had made.

Durham went to the house on Cleveland Street and saw the children on March 4, 2008,[37] and she discussed the conditions of the house with Mother.

---

[36]Durham said that it was not true that Mother never asked for bus passes or rides; the Department provided a lot of transportation for Mother.

[37]Durham saw T.M.J. but did not learn until later that he had ringworms that were not being treated because of the lack of Medicaid.

The Department found rat feces and feces on the walls. There were boards with nails sticking out of them. The food that was sitting out was not good. Pictures were taken of the conditions because they were endangering for the children. The conditions at the Cleveland Street residence violated the conditions of the monitored return, as did Mother's moving without telling Durham in advance. Durham asked Mother to clean up her residence to a livable standard.

Durham did not remove the children on March 4, 2008, because she wanted to give Mother "time to get it straightened up. They had just gotten there." Durham talked to her supervisors, and they were unmoved until they saw the pictures of the house.[38] At that point, the Department obtained full custody of all the children, including J.G.K., and gave Durham approval to remove the children.[39]

Durham took the police with her when she went to remove the children; Durham said that was not normal CPS procedure. Durham took the police because Mother had always told her that if she took Mother's children, Mother

[38]Durham did not take pictures at the Cleveland Street residence to try to make Mother look bad; there simply were not any "not bad places."

[39]The removal at the Cleveland Street address was due to the condition of the house, combined with other facts—that Mother had failed to keep up her Medicaid and was not getting T.Q.F. his medicine, that Mother had failed to keep up her food stamps, that Mother had also made no effort to become independent and had demonstrated that she could not provide for the basic needs of her family, that Mother had moved countless times without telling Durham her whereabouts, that Mother had planned to move to Texarkana with her boyfriend, and that there was no refrigerator and nothing in the cabinets.

would fight her. When Durham arrived at Mother's with the police, she heard Mother's voice coming from the house stating that she had a gun and would shoot. Mother's friends Ta'Niel and Shandreka were the only other adults in the house. The police were eventually able to diffuse the situation, and the children were brought out wearing the same clothes from the previous day and smelled because they had not bathed. After the removal, Mother left a voicemail for Durham stating that she did not want to talk to Durham anymore and that if Durham had anything to say, she could say it through the new caseworker.

When Durham removed J.G.K. in March 2008, she was not able to initially place her back with the same foster parent, but ultimately she was returned to the initial foster mother. Durham agreed with Mother's statement that J.G.K. had been in foster care most of her life.

Durham was present in April 2008 at the visit with Kristi Row when Johnson was introduced and took over Mother's case. Mother was angry and screamed because she thought J.G.K. had been hurt in foster care. Durham tried to talk to Mother about it, but she would not talk to Durham. Mother left and slammed the solid core door and broke it off its hydraulic door closer. Durham testified that she would be concerned about Mother's mental stability if Mother had been taking her medications when she broke the door at the visitation center. Durham saw J.G.K. during that visit and did not notice any bleeding or scratches on her face.

Durham said that if evidence showed that Mother had been living on her own with a lease of her own for eleven months and paying rent and that she was now receiving a disability check every month, that would be an improvement from when Durham left the case. However, Durham testified that her opinion would change if evidence showed that Mother was in the process of being evicted because that would be the same as when Durham had the case (i.e., Mother was homeless). Durham testified that her opinion would also change if evidence showed that Mother had spent more than she received and was having to rely on others because that would be similar to what had occurred when Durham handled the case. Durham disagreed that completion of parenting classes and completion of counseling would be an improvement because Mother had completed parenting classes and was in counseling while Durham was her caseworker. Durham had spoken to Mother several times in passing since Johnson had taken over the case, and Mother's temperament was good.

### C.    Dr. Hollis's Testimony

Dr. Hollis saw T.Q.F. for the first time on March 6, 2008,[40] when T.Q.F.'s foster parents brought him in to establish care and because he had recently been hospitalized with RSV, bronchiolitis, and pneumonia. T.Q.F.'s foster mother was concerned because he could wear the same clothes as when he left her home

---

[40]When T.Q.F. was two months old in March 2007, he was seen at a clinic and was in the twenty-fifth percentile on the growth chart. At his seven-month visit, T.Q.F. was a little above the tenth percentile. Dr. Hollis did not see T.Q.F. while Mother had him during the monitored return.

41

approximately seven months prior.[41]  Dr. Hollis testified that a healthy and appropriately growing child at thirteen months old should not be the same size as when he was eight months old.

Dr. Hollis's assistant weighed T.Q.F. on March 6, 2008.  The medical notes from the appointment do not indicate what type of clothes T.Q.F. was wearing or whether he had shoes on when he was weighed, but Dr. Hollis recalled that he was weighed with his full clothing, diaper, and shoes on, and his weight was below the fifth percentile.[42]  Dr. Hollis put T.Q.F. on a concentrated formula and instructed her staff to weigh T.Q.F. with only his diaper on at follow-up visits. When Dr. Hollis saw T.Q.F. at the second visit, which was one week after the March 6, 2008 appointment, he had dropped well below the fifth percentile; his weight dropped from nineteen pounds, two ounces to eighteen pounds, four ounces.  At the third visit, T.Q.F. weighed nineteen pounds, eight ounces.  At the

---

[41]T.Q.F.'s foster parents cared for him from birth until seven months, and T.Q.F. returned to their home after his hospitalization when he was approximately thirteen months old.

[42]Dr. Hollis was questioned extensively regarding the growth chart that she used for T.Q.F.  She testified that she had reviewed the perinatal records, showing that T.Q.F. weighed five pounds, six ounces at birth and was born premature at thirty-six weeks, six days.  Dr. Hollis testified that there is an adjusted growth chart for premature babies but that she did not use that chart because it goes up to only twelve months and because T.Q.F. was basically a full-term baby, as thirty-seven weeks is considered full term.  Dr. Hollis testified that charting a premature baby on a regular growth chart would make it fall lower because the pre-term growth charts are adjusted to reflect the weight differences in premature infants.  But Dr. Hollis later explained that the premature chart and the normal chart should coalesce at twelve months because a premature infant should be "totally caught up with [his] term peers."

fourth visit, T.Q.F. weighed nineteen pounds, thirteen ounces. For the most part, T.Q.F. thereafter continued to steadily gain weight. T.Q.F. was off the concentrated formula by the time he was eighteen months old, and he was between the twenty-fifth and fiftieth percentile on the growth chart on his third birthday.

Dr. Hollis diagnosed T.Q.F. with nonorganic failure to thrive after observing T.Q.F.'s rapid weight gain on increased monitored calories, even though the hospital did not diagnose T.Q.F. as failure to thrive on March 5, 2008, and none of Mother's other children had been diagnosed as failure to thrive. Dr. Hollis's opinion was that T.Q.F.'s nonorganic failure to thrive was caused by his not receiving an adequate amount of calories; T.Q.F. did not have a medical problem that contributed to his failure to thrive.[43]

Dr. Hollis testified that failure to thrive is caused by a systematic and ongoing failure to act. Dr. Hollis explained that a "failure to thrive" diagnosis could be given to (1) a child who is below the third percentile on the growth chart or (2) a child who has crossed two percentile lines and has fallen off the growth chart. Dr. Hollis testified that there are occasions when failure to thrive can be recognized in a child just by looking at him, and there are other occasions when that is not possible. She said that one might have suspicions that a child is

---

[43]Dr. Hollis treated T.Q.F. multiple times for ear infections after he moved back to foster care, but she testified that the ear infections did not cause him to drop two lines on the growth chart. Dr. Hollis referred T.Q.F. to an ear nose and throat specialist for tubes, and he underwent surgery to put tubes in his ears.

failing to thrive, but it cannot be diagnosed from looking at the child. Dr. Hollis, however, admitted that she had made that diagnosis the first time she saw T.Q.F. based on the foster mother's observation that he was wearing the same clothes as six months prior.

Although T.Q.F. gained 0.6 pounds per month during the seven months that he was in Mother's care and only 0.5 pounds per month while he was in foster care, Dr. Hollis testified that the failure to thrive happened only during the time that Mother was caring for T.Q.F. because that was when he crossed two lines on the growth chart. Even if Dr. Hollis had used the growth chart for a premature baby, T.Q.F. would have crossed more than two lines, supporting the basis for a failure to thrive diagnosis. Moreover, Dr. Hollis confirmed that a child who is gaining weight can still be diagnosed as failure to thrive because failure to thrive does not appear overnight; when a child is receiving calories but not the appropriate type of calories, he might fall outside the growth chart and become failure to thrive in three to six months.

Dr. Hollis said that each case is individual and that in this case, T.Q.F. could not find food, despite that the other children were not failing to thrive. Dr. Hollis said that depending on the condition of the family, how chaotic it is, what their living situation is, and the child's age, only one child in a large family might be diagnosed as failure to thrive.

Dr. Hollis opined that T.Q.F. was endangered because failure to thrive can be fatal. Dr. Hollis testified that Mother's failure to seek treatment for a child who

44

was not growing constituted medical neglect and endangering conduct. Dr. Hollis testified that there can be long-term effects for failure to thrive because it can permanently affect metabolism and intelligence. Dr. Hollis said that T.Q.F. is too young to know whether he will have long-term effects from his failure to thrive.

Dr. Hollis reviewed the photographs of the surroundings in which Mother's children lived, and Dr. Hollis testified that she believed J.G.K. was endangered by living in such surroundings. The food displayed in the pictures—meat was left out on the counter—was unsafe for children.

### D. Johnson's Testimony

#### 1. First Meeting with Mother

Linda Johnson, a caseworker with the Department, testified that her job was to arrange and provide concrete services (like beds, money to obtain a birth certificate, and clothing) to families who had cases with the Department. Johnson met Mother for the first time in April 2009 at the visitation during which Mother stormed out and broke the door because she was mad about scratches on J.G.K.'s face. Mother yelled at Durham when Durham told her that she was being inappropriate by yelling at her children. After Mother left, Johnson spoke to J.G.K. and investigated Mother's concerns. Johnson learned that J.G.K. had scratched herself in her sleep, causing faint little markings on her face. The markings required no medical attention or first-aid treatment. J.G.K. was smiling

45

and was not upset about the markings on her face, so Johnson did not understand why Mother was upset.

### 2. Service Plans

Johnson testified that she was required by law to provide a service plan because none of the exceptions in the family code applied. When she took over the case from Durham, she created a service plan and mailed it by regular mail (not certified mail) to Mother's attorney, but he never received it for some unknown reason. Johnson said that in hindsight it was a mistake to send the service plan to Mother's attorney and to expect him to go over it with her; Johnson admitted that she should have gone over it with Mother in May 2008. Johnson went over the service plan for the first time with Mother at the October 2008 status hearing. It was not the "very first service plan" that Mother had ever seen because she was already working services on her other children as of April 2008. When Johnson went over the service plan with Mother in October 2008, the Department's goal was reunification if it saw appropriate progress from Mother in working her services.[44]

Mother started working services on J.G.K.'s case in October 2008. Mother's plan required her to obtain appropriate housing and a legal source of income, and Johnson said that Mother completed those tasks. However, Johnson said that Mother did not complete her service plan because she did not

---

[44]Johnson did not know when the Department decided to pursue termination instead of reunification.

46

maintain stability; she failed to pay her rent and bills[45] and was attempting to move again. But Johnson agreed that Mother's utility issues at her current apartment—which included having her water, electricity, and gas turned off at various times even though her rent included "all bills paid"—constituted good reasons for a lease dispute and for her wanting to move.

Johnson drafted another service plan for Mother[46] when she lived at the mission and worked her services through CWJC; Mother had not completed all of her services under the initial service plan and had not appeared for all her visits. Johnson never told Mother that if she worked all of her services that all of her children would be returned to her. Mother had countless programs made available to her—including CWJC, Faith City Mission, Social Security, Helen Farabee, counseling, and Supported Employment—but she failed to make herself available for these services once she received her Social Security lump sum check and monthly benefits.

### 3. Mother's Living Arrangements

Mother would not tell Johnson where she was living in April 2008. Johnson could not effectively set up services and make home visits without knowing where Mother lived.

---

[45]Johnson testified that the Department does not remove children simply because parents get behind on their bills or because parents are poor, but the Department does remove children if their parents' inability to provide for the children endangers them.

[46]Johnson never received a signed service plan from Mother.

47

Johnson eventually learned that Mother lived with her cousin Darissa at 900 Juarez for approximately a month. Mother had to leave because Darissa's boyfriend did not like her and made Darissa choose between Mother or him; Darissa chose her boyfriend and made Mother move out at 3 a.m. Mother called Johnson the next day and told her that she had been forced to move.

Following one of her visitations at the CPS office, Mother told Johnson that she had moved to the Sun Valley Apartments with a person named Ebony. Mother did not have her children living with her at that time. Johnson testified that Reed had taken pictures of the living room, kitchen, and bathroom at the Sun Valley Apartments when Mother lived there and that those three rooms "looked better" than the bedroom, a photo of which had been admitted into evidence.

Mother had to leave Ebony's apartment because Ebony had gotten in trouble with the apartment's management as a result of Mother's not being listed on the lease of the HUD apartment. Even though every service plan required Mother to tell Johnson where she was living, Mother did not do that, though she kept in fairly regular contact with Johnson from March 2008 to September 2008.

In August or September 2008, Mother moved into the mission while she was pregnant with G.J.M.-B. Johnson made visits to the mission and noted that Mother's room was very nice and that the mission provided Mother with clothing, toiletries, and transportation.

### 4. CPS's Requirements for Mother While She Lived at the Mission with G.J.M.-B.

In November 2008, when Mother gave birth to G.J.M.-B., CPS started an investigation because Mother had five children in the Department's care. At the nonemergency removal hearing, the trial court ordered that the Department be given managing conservatorship but that G.J.M.-B. be placed with Mother under a monitored return. The trial court did not say that Mother needed CPS's approval to move from the mission, but the trial court told Mother not to move from the mission without getting prior approval from the attorney ad litem for G.J.M.-B., from CASA, and from the trial court.

While Mother was at the mission, she was required to keep G.J.M.-B. with her at all times. While Mother was living at the mission, she successfully completed the CWJC, with the exception of obtaining her GED. The CWJC set up a plan for Mother to complete her GED because they wanted her to work toward that. Mother was given a mentor who was supposed to work with Mother on an ongoing basis to prepare her for taking her GED, but the mentor never saw Mother again. Mother told Johnson that she had problems getting child care so that she could attend classes; Johnson told Mother to get on the waiting list at Child Care, Incorporated, but Mother did not do so.

Throughout the time that Mother was at the mission, she was extremely diligent about visiting with her other children, including J.G.K. With the exception

of when Mother was bedridden prior to giving birth, she made all her visits and made up any visits that were cancelled due to inclement weather.

While G.J.M.-B. was in Mother's care but in the Department's custody, the trial court ordered Mother to apply for Social Security benefits because Mother had previously decided against applying. Mother was successful in obtaining benefits on her first try. In May 2009, Mother received her lump sum award of $2,000 from Social Security disability, and she moved out of the mission without obtaining permission from the attorney ad litem for G.J.M.-B., from CASA, and from the trial court.

### 5. Mother Moved without Prior Approval

Johnson and CASA discovered that Mother had moved to 1919 8th Street and went to that address and knocked, but no one answered. Johnson said that they were looking in the windows because they were looking for G.J.M.-B. since the Department had custody of her. Johnson thereafter obtained an order from the trial court to remove G.J.M.-B. from Mother because she had moved from the mission without court approval. Johnson removed G.J.M.-B. because Mother had violated the trial court's order, though Mother's house was found to be satisfactory.

Johnson said that Mother did well at the mission but that her situation became a concern when she moved. The Department was concerned about Mother's ability to provide for herself and for G.J.M.-B.

**6.      CPS's Attempts to Get Mother into the Housing Authority**

Johnson testified that instead of travelling to her son's wedding on her day off, she helped Mother get unbarred from the Housing Authority. Johnson went to the hearing and testified on Mother's behalf because she wanted to help her obtain affordable housing so that Mother would not have to spend so much of her monthly check on housing.[47] The trial court wanted Mother to hold off on getting housing, but Mother spent $500 a month on an apartment.

**7.      Mother's Apartment Found Adequate and Home Visits**

In May 2009, the trial court found that the apartment was adequate and safe for G.J.M.-B. The Department was dismissed from the case at that time, and since then, Mother had kept Johnson apprised of where she lived. Johnson said that she had visited the home because she had cases on Mother's other five children.

Johnson was present when Mother told the trial court that the mission gave her everything and that she was able to keep the baby bed and the stroller. Johnson learned that was untrue when she visited Mother's home and observed a "rickety" and unsafe baby bed. Johnson could not provide a baby bed because G.J.M.-B. was not in the Department's care.

---

[47]Johnson testified that as of September 2009, Mother had not gotten G.J.M.-B.'s Social Security card, which was needed in order to get into the Housing Authority.

51

Johnson visited Mother's home monthly during 2010 to see how she was doing. Johnson had seen T.M.J.'s father at Mother's house three times and had seen Mother's mother at her house five times. Johnson knew about T.M.J.'s father's criminal history, which included assault family violence, and was concerned that Mother let him stay in her home with her child.

Johnson noted that Mother kept up the apartment until right before trial when it had become cluttered. Johnson had also seen a hole the size of a fist in the wall by the front door. Johnson testified that she had checked the hole in the wall near Mother's door and determined that it was not caused by the door knob because the two were not at the same height. Johnson testified that this was not the type of environment that J.G.K. should be sent back into.

Although Mother had alleviated the Department's concerns regarding the house she was currently in at the time of trial, that house was not permanent as Mother was in the process of being evicted. Mother had managed to some extent because she still had housing, but Johnson testified that less than a year of renting one place was merely a start and that history was repeating itself since Mother was being evicted from her residence, which caused the Department concern.

### 8. Visitations with Children

During most of the visits that Johnson observed at the visitation center, D.J.F. did not stay in the room but wandered down the hall to another visitation room or went to "hang out" with Olivia Carillo, the technician who monitored the

door at the visitation center. Most of the time, Mother allowed D.J.F. to wander off and did not go get her; Carillo had to bring her back. Mother's children usually referred to Mother by her first name but sometimes called her "mama." Mother corrected her children when they called her by her first name.

Johnson had observed Mother tell J.G.K. that if she did not behave, Mother would tell her foster parents; Johnson testified that such tactics were not appropriate disciplinary procedures for a parent during a visitation. Johnson said that, in her opinion, it was inappropriate for Mother to threaten to tell the foster parent because Mother was the parent and was in charge of the child during her visitation time. However, Johnson also testified that Mother had disciplined her children at a visitation by putting them in time out, which was appropriate.

Mother was diligent in visiting prior to 2010, and it was not like her to leave a visit early. Johnson did not recall any visits that Mother had missed prior to February 2010 because G.J.M.-B. or Mother was sick. Johnson said that the termination trial was the first time she had heard of Mother's illnesses. It was also the first time that Johnson had learned that Mother had gone shopping in Lawton in lieu of visiting her children.

### 9. Mother's Anger Issues

Johnson believed that Mother's reaction toward the scratches on J.G.K.'s face showed her instability and her inability to control her anger. Johnson said that Mother's reaction gave the Department concern regarding placing a child in her home. Johnson testified that since September 2009, Mother had been less

volatile and had not yelled at her children as often. But Mother had lost her temper with adults since September 2009, including yelling at Carillo; Safe Harbor, which CPS contracted with to transport the children to the visits; and caseworkers, including Johnson. Mother had also yelled at J.G.K.'s foster mother at the visitation center. Johnson thought that in recent months Mother seemed not as easily angered; she still had outbursts, but they were fewer. Johnson had no personal knowledge of Mother ever physically hitting her children.

In August 2009, Mother called Johnson asking for money so that she could get unbarred from the Housing Authority, and Mother became angry when she learned that Johnson could not give her that money. Mother yelled at Johnson and hung up on her.

Johnson believed that Mother's actions were not indicative of someone who would do anything for her children. Mother's actions revealed that her medication did not keep her calm at all times, prevent her from getting angry, or help her maintain stable emotion.

### 10. Mother's Finances

When Mother told Johnson how difficult it was to pay her bills on $675 a month and housing of $500, Johnson suggested that Mother get into the Housing Authority and supplement her income by gaining employment through the Supported Employment program at Helen Farabee, which would not cause her to lose her disability benefits. All that was required of Mother was that she make

and keep an appointment and complete the paperwork. Helen Farabee made an appointment for Mother, but she failed to keep it. Johnson was not surprised that Mother's spending exceeded her income.

Johnson had heard that Mother could not take classes nor get a job because no one would take care of G.J.M.-B. This was in contrast to testimony from prior hearings that everyone wanted to babysit G.J.M.-B. "at the drop of a hat." However, Mother was not required to get a job after she procured Social Security disability benefits.

Johnson delivered six budget forms to Mother for her to complete to help her understand that with each child, the cost would become exponentially greater. Johnson asked Mother to prepare a budget under the scenario if she had one child living with her and then *if* she had two children living with her, and so forth, so that she would have an understanding of how much money it would cost with each child. Mother's budgets, which increased by only five or ten dollars per month with the addition of each child, showed that she did not understand how much having additional children at home would cost. Johnson did not know prior to Mother's testimony that she had dropped her WIC. Johnson said that WIC could have supplemented Mother's food stamps.

Johnson found out about Mother's monetary problems and her eviction at the trial because Mother did not tell Johnson that the eviction had been filed. The pending eviction plus the fact that Mother had been relying on money from T.M.J.'s father raised questions about her stability during the year preceding the

trial.  Johnson believed that Mother should have taken advantage of government programs that were available to help her.  Johnson did not believe that Mother had been responsible with her money.

### 11.  Mother's Car

Mother told Johnson that she had bought a car, but she did not tell Johnson that she was paying for it monthly and that she did not have car insurance or a drivers' license.  Had Mother talked to Johnson prior to buying the car, Johnson would have tried to dissuade her from buying a vehicle she could not afford and would have continued to provide her with bus passes.  Johnson testified that Mother stopped receiving bus passes in February 2010 because she had a car.  Johnson agreed that having transportation was a good thing only if it was within Mother's financial means and she had the ability to carry insurance and a legal means of operating the transportation.

### 12.  Status of Mother's Other Cases

The Department accepted permanent managing conservatorship of D.J.F., T.M.J., and J.K.P. because it was running out of time to resolve the cases.  The Department's position was that it did not recommend that Mother be given D.J.F., T.M.J., and J.K.P.  Johnson testified that the Department planned to file new petitions to terminate Mother's parental rights to those three children at the conclusion of J.G.K.'s case.

Johnson knew that J.K.P. had serious problems and had been in a psychiatric hospital in the last year.  Johnson testified that all the days of school

56

that J.K.P. missed adversely affected him, that he had been held back at least once, that he was having a hard time in school, and that he was in a special program at school and was trying to catch up.

As far as Johnson could tell, Mother was a good mother to G.J.M.-B., and Johnson felt G.J.M.-B. should stay in Mother's care.

### 13. J.G.K.'s Case

In March 2008, J.G.K.'s case started anew, while the other children were involved in monitored returns. At the time of the termination trial, J.G.K. had spent most of her life in foster care, away from Mother. Johnson testified that J.G.K. was a normal child who did not have special needs. She lived in Graham and did well in school and was in the first grade. J.G.K. started school late but had caught up. There were no discipline problems in school.

J.G.K.'s foster parents also had D.J.F. in their home. The two sisters got along well together. There was an older adopted daughter in the home, and the three girls got along well. The foster mother cared for J.G.K. prior to her case being dismissed in August 2007, and J.G.K. moved back in with the foster mother in July 2008. J.G.K. and the foster mother have a loving relationship. Johnson testified that J.G.K. and D.J.F. visit frequently with T.M.J. because their foster mothers are friends.[48]

---

[48]T.Q.F. was in an adopting placement with the foster parents who were caring for J.K.P., and the two boys have a relationship with J.G.K.

Johnson had witnessed J.G.K. reacting badly during a visit with Mother and knew of times when J.G.K. did not want to attend visitation.

### 14. CPS's Recommendation for J.G.K.

Mother had received more than four chances with the Department.[49] Johnson testified that all of the chances Mother had received as of the time of the termination trial were to the detriment of her children and that it would not be in the children's best interest to continue giving Mother chances. Mother testified that CPS became involved with J.K.P. after Mother smoked marijuana and passed out, which was Mother's first chance. When D.J.F. went to the hospital and the children were removed, that was Mother's second chance. When T.Q.F. was removed because Mother tested positive for cocaine, that was her third chance.[50] All of the children were returned to Mother in August 2007 but were later removed, and that was her fourth chance. After the children were removed again, Mother went to the mission and worked services through the CWJC but Mother did not following the trial court's rules, which was her fifth chance. After her fifth chance, Mother failed to demonstrate that she had learned her lesson and had become stable and responsible. During the two years that Johnson worked the case, she never heard Mother accept responsibility.

---

[49]Johnson said that "a chance" is an opportunity to make a change and that Mother had not made appropriate lasting change.

[50]T.Q.F.'s diagnosis of failure to thrive was an endangering condition.

58

Johnson agreed that Mother's irresponsibility resulted in the pattern that was seen in her past and that was currently repeating itself as of the time of the trial. Johnson believed that the instability and irresponsibility in Mother's life endangered the children. Johnson testified that Mother had not shown stable housing or the ability to provide for herself because Mother relied on others to make up the gaps in her budget as a result of her irresponsibility in utilizing her financial resources. Johnson was not opposed to Mother's taking advantage of government programs but thought the most appropriate thing would be for Mother to live within her means.

Johnson did not dispute Mother's testimony that G.J.M.-B. was doing well, but the fact that Mother was doing well with G.J.M.-B. did not change the Department's opinion of Mother's parenting abilities regarding J.G.K. Johnson asked the jury to terminate Mother's parental rights because she believed it was in J.G.K.'s best interest and would provide closure and finality for her. Johnson said that her recommendation regarding best interest included J.G.K.'s desires.

Johnson testified that it was the Department's plan to allow the foster mother to adopt J.G.K. if Mother's parental rights were terminated. Johnson testified that the foster mother could provide for J.G.K.

### E. CPS Investigator's Testimony

Patrick Barber, an investigator with CPS, testified that he was assigned to check on Mother and G.J.M.-B. after she was born. Barber said that G.J.M.-B. did not test positive for drugs and was a healthy baby; there were no allegations of abuse of G.J.M.-B. at that time. Barber met Mother and G.J.M.-B. at United Regional Hospital right after delivery and spoke with Mother regarding where she planned to live. Barber learned that Mother was planning to return to Faith City Mission with the baby. Barber visited Mother at the mission later that same week and found that Mother had "a lot of stuff for the baby."

Due to Mother's extensive history with the Department,[51] they were concerned about G.J.M.-B.'s welfare and, at one point, decided that it would be in the child's best interest to seek a removal. The Department initially sought an emergency removal around November 19, 2009. The Department later tried a nonemergency removal, and the trial court gave custody to the Department but allowed G.J.M.-B. to stay with Mother.

Barber met with Mother three more times at the mission but did not find anything inappropriate; Mother was doing all the things that a mother should do for her newborn. Barber said that he had testified at a hearing involving G.J.M.-B. and had recommended that G.J.M.-B. was safe and that Mother had

---

[51]Barber had also worked a previous case with Mother back in March 2005, which focused on J.K.P.

everything that she needed for G.J.M.-B. at that time; she was not in an emergency, life-threatening position.

### F.     Mission Director's Testimony

John Welter, the director of Wichita Falls Faith City Mission, testified that he was familiar with Mother because she came to the mission when she was homeless and spent September 2008 through summer 2009 at the mission. Welter said that Mother had stayed at the mission on several different occasions and that she was barred from the mission at several different times. Welter said that when Mother first arrived at the mission, "most of the time [he] wanted to bury her out in the backyard"; there was daily conflict because she was not willing to abide by the rules. But the last time that Mother stayed at the mission, "it was like some miracle had changed her to where she became a person who was willing to do whatever it took. It was a complete change of her personality."

Welter testified that after Mother gave birth to G.J.M.-B., she moved into a family room with her at the mission. Welter described Mother as "[a] doting mother" of G.J.M.-B. and said that she properly nurtured and fed her. Mother followed the rules of the mission. When Mother wanted to leave the mission, Welter had a conversation with Mother about staying at the mission for three or four weeks to see if she could get unbarred at the Housing Authority so that she could avoid paying $500 in rent each month for an apartment.

Welter was surprised that Mother had lied under oath by testifying that the mission had given her a baby bed, that she had moved out of the mission, and

61

that she had paid off a car. Welter was surprised that Mother went shopping and missed a visit with her children after not having seen her children in a month due to illness and weather cancellations. Welter was also surprised to learn that Mother had entered into a sexual relationship with T.M.J.'s father, whom she had previously obtained a protective order against in 2005 and who was in jail again for violating the conditions of his deferred adjudication community supervision for his assault family violence charge. Welter was not surprised that Mother's expenses were 150% of her income. He said that it would disappoint him to know that Mother was over budget because she was paying off tickets that she had received for driving without a license. Welter said that he would not be surprised to learn that Mother was in the process of being evicted. Welter agreed that all of the preceding events had happened after he thought that Mother's demeanor had changed and that she was willing to do whatever it took to have her children returned.

Welter was pleased to hear that Mother had been in her lease for almost a year, that she was taking her prescribed medications, that she had two other residences lined up in the event of an eviction, that she had fought for her children and had never given up, and that she had a legal source of income. Welter testified that Mother was a success because she had not lived at the mission for eleven months.

### G.    Mother's Landlady's Testimony

Mandy Blevins testified that she was the landlady for Mother at the 1919 8th Street address where Mother lived at the time of the termination trial.  When Mother rented the apartment in May 2009, Blevins told Mother that it was not ready, but Mother said that she needed to find a place for her and her baby because CPS did not like Mother's being at the homeless shelter with her child.  Blevins said that she was fixing "the stuff that absolutely needed to be fixed at that time" so that the apartment could be inspected by CPS and CASA.

Blevins said that Mother's rent was $500 per month and included gas, water, and electricity.  Blevins confirmed that Mother's lease required her to make repairs that cost less than $50 and to submit repair requests in writing.  Blevins opined that putting a closet door back on its hinges would cost less than $50 and so would repairing the kitchen cabinet door that was off its hinges and removing rust stains from the bathtub.  Blevins testified that she had not received any repair requests in writing from Mother.

Blevins said that Mother had informed her about holes in the wall "the other day."  All previous holes had been patched with drywall or the sheetrock had been replaced, so Blevins was not aware of any holes that were present in the bedroom when Mother moved in.  Blevins testified that the repair made to the kitchen floor was done to replace a pipe, that plywood (the same subflooring used in the rest of the apartment) had been used to cover the hole, and that the only thing missing was the "stick tile or whatever that's also through the house."

63

Blevins said that the plywood in the kitchen had not been covered after the repair due to "oversight." Blevins said that the notice from the city that she had received regarding housing code violations listed lack of smoke detectors. Blevins said that smoke detectors were present when Mother moved in, but Blevins had later found one smashed on Mother's front porch.

Blevins admitted that she had encountered problems with the electric company and the gas company because the bills were not in her name, but she said that the electricity and gas did not stay off very often for very long. Blevins admitted that Mother's water heater was not working "for a while" and that Mother's attorney had called regarding that problem. Blevins said that on a couple of occasions, she had tried to send people to repair Mother's water heater, but Mother had refused to let them come in her house. Blevins admitted that Mother's water was turned off once or twice for nonpayment due to water leaks that caused a $600 bill, which Blevins was in the process of paying. Blevins said that the water "got readily turned back on." Blevins admitted that Mother's property had not been exterminated; Blevins had provided "bombs and Combat gel" to the other residents but not to Mother due to her hostility.

Blevins said that initially she had no problems with Mother but that it later "seemed like nothing was ever right, nothing was ever good enough," and Blevins received texts with obscenities from Mother. Blevins said that every time she tried to help Mother, she had been cursed or threatened. Blevins had also

received complaints from Mother's neighbors that she had cursed at them and yelled at them.

Blevins said that once when she went by to pick up Mother's rent payment, Mother was sitting on her couch with a black eye and told Blevins that her brother had hit her but that she had told CPS a different story. The weekend before the trial, Blevins heard Mother's brother Prentice talking about beating up a girl over the weekend and saying that Mother had pictures of her face.

Blevins testified that there have been a few times when Mother has not paid the full amount of rent. Blevins noticed that Mother's rent payment became erratic in January or February of 2010; Mother told her that her car was in the shop and that she had to get it fixed. Blevins started charging Mother late fees in April 2010. At the time of the trial on May 20, 2010, Mother owed $495 in rent plus late fees.

Blevins had started eviction proceedings against Mother and had given her an eviction notice on April 20, 2010, with three days' notice to vacate. Mother responded to the eviction notice by yelling at Blevins during a phone call and questioning why Blevins was evicting her. Mother called code enforcement the next day. The eviction hearing was set for May 19, 2010, during the termination trial. Blevins's husband received a phone call right before the eviction hearing, notifying him that Mother's attorney had filed a continuance. Blevins testified that she intended to follow through with the eviction. Blevins said that in the event that the eviction did not go through, she did not plan to renew Mother's lease.

65

Blevins said that only Mother and her child are supposed to be staying in the apartment, but Blevins was aware that Mother's mother, brother, and sister had stayed for longer than a day. Blevins said Mother's mother was staying with her in December 2009 to help her out. Blevins admitted that the lease did not prohibit overnight guests.

Blevins agreed that Mother loves G.J.M.-B. and was appropriate with her. Blevins said that due to Mother's failure to pay rent, she could have turned off the electricity but chose not to because of G.J.M.-B.

### H. CASA Worker's Testimony

Mauri Reed testified that she was employed by CASA and had been involved with J.G.K. for almost two years as her CASA worker. Reed described J.G.K. as

> a precious little girl. She is very shy upon initially meeting her. She's smart. She's inquisitive. It takes her a while to get used to you. She loves writing. She is mastering reading right now. She struggles in reading. She loves school. She loves her foster mom. She's a teacher. She loves her foster sisters, and currently she's playing softball for The Crush.

Reed disagreed with the description of J.G.K. as a people pleaser; she countered, "I think she's a shy little girl, but I don't necessarily -- I think she understands more than, you know, you give her credit for. I think -- I think she knows what she wants [i.e., to be adopted by her foster parents]." J.G.K. had never told Reed that she did not love Mother. However, she told Reed that she was scared of Mother, that Mother was loud and yelled a lot, and that she did not

66

want to see Mother anymore. Reed had not seen Mother yell at J.G.K. during a visit, but she had witnessed Mother raise her voice. Reed said that it was a fight every week to get J.G.K. to go to visit Mother and that J.G.K. had told her that she "doesn't ever want to visit her mommy anymore."

Reed did not think that Mother had been diligent with her visitation in 2010. With regard to the visits Mother had missed, Reed did some investigation and did not believe that Mother and G.J.M.-B. were ill during all of the missed visits. Reed said that she went to Mother's house after she missed a visit and was told by T.M.J.'s father and Mother's brother that Mother and G.J.M.-B. were not there—even though Reed heard a baby inside the home—and that they had not been sick.

Reed testified that Mother had asked both CPS and CASA for help and had asked Reed for rides. Reed took Mother to the Social Security office, and Mother received her disability income. Reed also took Mother to the Social Security office to obtain a Social Security card for G.J.M.-B. Reed said that Mother had asked CASA for so many things that she was no longer allowed to give her any more concrete services because she had "surpassed any other client that we've ever had. We've helped her more than any other one." Reed said that it can be a positive and a negative for clients to ask for help because clients need to learn how to get help to prepare for when CASA is no longer part of their lives.

Reed saw Mother's home after she first moved in and told Mother the repairs that needed to be made; Mother made them. Thereafter, Reed testified in T.Q.F.'s case, and Reed's relationship with Mother deteriorated. Reed said that Mother had often become belligerent, rude, and pouty; had hung up on her; and had a violent demeanor at times. Reed had seen an improvement in Mother's demeanor, but the angry demeanor was still present. Mother had threatened by text that she would call the police if Reed came to her house anymore. Mother also called Reed's supervisors and complained about her. Reed had explained to Mother that she was required to visit Mother's house, but Mother did not care. Reed had gone to Mother's house four times since she had moved into the house, but Mother had refused to let her in. The last time Mother allowed Reed to come in her house was May 2009. Reed was concerned that Mother had engaged in a relationship with T.M.J.'s father again and found out about it when she saw him at Mother's residence. Reed learned about Mother's eviction the week before the trial, and it concerned her.

Reed did not dispute that Mother loved her children, but Reed had sat through all of the trials and had not heard anything that made her believe that Mother had truly changed. Reed did not believe that Mother's actions were indicative of someone who would do whatever it took to have her children returned.

Moreover, J.G.K. did not want to go back to Mother; she wanted to stay with her foster family. Reed testified that if J.G.K. was taken out of her foster

home and was placed with Mother that it would be emotionally detrimental to her, that the progress she had made with her foster family would be wiped out, and that she would revert back substantially.

## I. Jury's Verdict

After hearing the above evidence, the jury found by clear and convincing evidence (1) that Mother had knowingly placed or knowingly allowed J.G.K. to remain in conditions or surroundings that endangered her physical or emotional well-being, (2) that Mother had engaged in conduct or knowingly placed J.G.K. with persons who engaged in conduct that endangered her physical or emotional well-being, and (3) that it would be in J.G.K.'s best interest to terminate Mother's parental rights to J.G.K. The trial court received the jury's verdict as tendered and signed a decree of termination. This appeal followed.

## III. MOTHER'S DUE PROCESS RIGHTS WERE NOT VIOLATED

In her first and second issues, Mother argues that the trial court denied her due process and abused its discretion by denying her pretrial motion to dismiss for due process violations. Specifically, Mother argues that (1) no temporary orders were reduced to writing following the adversary hearing; (2) Mother's rights were prejudiced when two cases were tried separately, despite a consolidation order; (3) the service plan was not discussed with Mother until October 2, 2008, which deprived Mother of four months' time to work her plan; (4) no status hearing was ever held as required by family code section 263.106; (5) no hearing was held on the motion to retain, which deprived her of her due

process right to appear and contest the findings required for extension by family code section 263.401; (6) no extraordinary circumstances existed to retain the suit on the trial court's docket; and (7) the previous complaints, individually and in sum, denied Mother the procedural guarantees of the Texas Family Code to such an extent that her due process rights were violated. We previously addressed Mother's similar due process complaints in a case involving one of her other children in *T.T.F.*, 331 S.W.3d at 474–80, and we cite heavily to that case for our analysis here.

## A. Not Reducing Temporary Orders to Writing Following Adversary Hearing

Mother argues that the trial court violated her procedural due process rights by failing to issue written temporary orders following the March 27, 2008 adversary hearing. Specifically, Mother contends that "[p]rior to the time the original Associate Court bench trial began, there was no record of the Adversary Hearing; therefore the terms and conditions by which [Mother was] to obtain return of the child were not known." Mother states that temporary orders were not signed until August 21, 2009, and were not filed until September 3, 2009. We set forth the law in *T.T.F.* as follows,

> Family code section 262.201(a) requires the trial court to conduct a full adversary hearing no later than fourteen days after the governmental entity takes possession of the child. Tex. Fam. Code Ann. § 262.201(a) ([West] Supp. 2010). Section 262.201(b)(1) requires the trial court to order the child returned unless the court finds sufficient evidence of (1) a danger to the child's physical health or safety that "was caused by an act or failure to act of the person

70

entitled to possession" and that "for the child to remain in the home is contrary to the welfare of the child." *Id.* § 262.201(b).

331 S.W.3d at 476–77.

Mother's complaint is that the trial court did not issue a written order setting forth the terms and conditions under which she could regain possession of J.G.K. But section 262.201 does not require the trial court to issue an order following the adversary hearing that sets forth the terms and conditions under which she could regain possession of the child. *See generally* Tex. Fam. Code Ann. § 262.201(a)–(g). Therefore, we hold that the trial court did not violate Mother's procedural due process rights by failing to issue a written order setting forth the terms and conditions under which Mother could regain possession of J.G.K. *See T.T.F.*, 331 S.W.3d at 477. We overrule this part of Mother's first issue.

## B.    Separate Trials

Mother next argues that the trial court consolidated this case with a different case involving another of Mother's children (T.Q.F.) but denied her right to procedural due process by subsequently conducting separate trials. She argues that her rights were prejudiced by the trial court's failure to conduct a joint trial.

We set forth the law in *T.T.F.* as follows,

> A severance splits a single suit into two or more independent actions, each action resulting in an appealable final judgment. *Van Dyke v. Boswell, O'Toole, Davis & Pickering*, 697 S.W.2d 381, 383 (Tex. 1985); *Aviation Composite Techs., Inc. v. CLB Corp.*, 131 S.W.3d 181, 188 (Tex. App.—Fort Worth 2004, no pet.). Severance of claims under the Texas Rules of Civil Procedure rests within the

71

sound discretion of the trial court. *Liberty Nat'l Fire Ins. Co. v. Akin*, 927 S.W.2d 627, 629 (Tex. 1996) (orig. proceeding); *Aviation Composite Techs.*, 131 S.W.3d at 188. The controlling reasons for a severance are to do justice, avoid prejudice, and further convenience. *Guar. Fed. Sav. Bank v. Horseshoe Operating Co.*, 793 S.W.2d 652, 658 (Tex. 1990) (op. on reh'g); *Aviation Composite Techs.*, 131 S.W.3d at 188.

331 S.W.3d at 477.

Here, as in *T.T.F.*, Mother has not provided any support for her contention that her rights were prejudiced by conducting separate trials. In her brief in this court, the totality of Mother's prejudice argument states:

> By Order of the referring Court, the two causes were to be tried jointly, and without such joint trial, Respondent-Mother's rights were prejudiced. The children in the different causes had different attorneys ad litem, as did the Respondent-Fathers. The Order consolidating the two causes was not appealed by the Department, and Respondent-Mother was entitled to have the two causes tried together.

Because the severance of claims rests within the sound discretion of the trial court; because the primary reasons for a severance are to do justice, avoid prejudice, and further convenience; and because Mother has not established any prejudice that she suffered from the separate trials, we hold that the trial court did not deny Mother due process by conducting separate trials. *See id.* at 477–78; *see also* Tex. R. App. P. 38.1(h) (requiring a clear and concise argument with appropriate citations to legal authorities); *Fredonia State Bank v. Gen. Am. Life Ins. Co.*, 881 S.W.2d 279, 284 (Tex. 1994) (noting long-standing rule that a point may be waived due to inadequate briefing). We overrule this portion of Mother's first issue.

72

**C.     No Signed Service Plan within Forty-Five Days of Adversary Hearing**

Mother also argues that her procedural due process rights were violated because the Department did not obtain her signature on the service plan it filed after the March 27, 2008 adversary hearing.  She contends that the service plan was not effective until she reviewed and signed it with the caseworker on October 2, 2008, and that the delay deprived her of four months of time to work on her service plan.

We set forth the law in *T.T.F.* as follows,

> Family code section 263.101 requires the Department to file a service plan no later than the forty-fifth day after the trial court renders a temporary order appointing the Department as the temporary managing conservator.  Tex. Fam. Code Ann. § 263.101 ([West] 2008).     Section 263.103(c), however, permits the Department to file the service plan without the parent's signature if it "determines that the child's parents are unable or unwilling to sign the service plan."   *Id.* § 263.103(c) ([West] 2008).   Section 263.103(d)(2) in turn provides that the service plan takes effect when the Department "files the plan without the parents' signatures."  *Id.* § 263.103(d).

331 S.W.3d at 478.

Here, Johnson testified that when she took over the case in March 2008, she created a service plan and mailed it by regular mail (not certified mail) to Mother's attorney.  Johnson said that in hindsight it was a mistake to send the service plan to Mother's attorney and to expect him to go over it with Mother. Johnson said that she went over the service plan for the first time with Mother at the October 2008 status hearing.

73

But Johnson testified that this was not the "very first service plan" that Mother had ever seen because she was already working services on the other children as of April 2008. *See id.* (stating that Mother's service plan took effect when the Department filed it on April 29, 2008, without Mother's signature, even though Mother did not go over the plan with her attorney until May 18, 2008). The State notes in its supplemental brief that Mother's service plan in this case, like the one in *T.T.F.*, required her to attend counseling and parenting classes, and Mother went over that plan with her caseworker in May 2008. According to a permanency progress report, appointments were set up in June and July 2008 for Mother to attend counseling and parenting classes, but Mother no-showed.

The State also notes that Mother had been volatile at the time of the filing of the service plan due to the re-removal of T.Q.F. and that was the reason the Department filed the service plan without Mother's signature. *See id.*; *see also* Tex. Fam. Code Ann. § 263.103(c) (providing that service plan may be filed without parent's signature if parent is unwilling or unable to sign it). Furthermore, Mother's parental rights were not terminated pursuant to a finding under Texas Family Code section 161.001(1)(O) for failing to comply with a provision of a court order. *See* Tex. Fam. Code Ann. § 161.001(1)(O).

On these facts, we hold that the service plan pertaining to J.G.K. that was filed on April 29, 2008, without Mother's signature, and which became effective on that date, did not violate Mother's procedural due process rights. *See T.T.F.*,

74

331 S.W.3d at 478; *see also* Tex. Fam. Code Ann. § 263.103(c), (d). We overrule this part of Mother's first issue.

### D.    Lack of Status Hearings

Mother also argues that the trial court violated her procedural due process rights by not conducting a status hearing within sixty days of the initial temporary order in violation of Texas Family Code section 263.106. Specifically, Mother argues that no status hearing was ever held in this case and that no hearings were held until the permanency hearing on March 30, 2009, over a year after the March 27, 2008 adversary hearing. Mother misstates the procedural history: a status hearing was held on October 2, 2008; an initial permanency hearing was held on March 30, 2009; and a subsequent permanency hearing was held on July 20, 2009.

Family code section 263.201(a), not section 263.106, sets forth the time during which the status hearing is to be held. Section 263.201(a) requires the trial court to "hold a status hearing to review the child's status and the service plan developed for the child" no later than sixty days after the trial court renders a temporary order appointing the Department as temporary managing conservator of the child. Tex. Fam. Code Ann. § 263.201(a) (West 2008). Similarly, section 263.304(a) requires the trial court to conduct an initial permanency hearing within 180 days of the temporary order. *Id.* § 263.304(a) (West 2008). Finally, section 263.305 requires the trial court to conduct subsequent permanency hearings within 120 days of the most recent permanency hearing. *Id.* § 263.305 (West

75

2008).  It is undisputed that the trial court did not conduct a status hearing within sixty days of the temporary order, an initial permanency hearing within 180 days of the temporary order, or subsequent permanency hearings within 120 days of the most recent permanency hearings.[52]

As we stated in *T.T.F.*,

> In a slightly different context, this court held in *In re E.D.L.*, 105 S.W.3d 679, 688 (Tex. App.—Fort Worth 2003, pet. denied), that although family code section 262.201(a) requires a trial court to conduct a full adversary hearing within fourteen days of the date a governmental entity takes possession of a child, the requirement is procedural, not jurisdictional.  In part because section 262.201 does not contain a remedy for failing to conduct a full adversary hearing in a timely manner, we held that the failure to timely conduct a full adversary hearing did not require dismissal of the termination proceeding.  *See id.* at 686–88.  We also held that both the Department and the parent had "the right to compel the trial court by mandamus to conduct the adversary hearing promptly."  *Id.* at 688.

331 S.W.3d at 479.

Here, although Mother contends that her procedural due process rights were violated and does not ask us to hold that the trial court should have dismissed the case once it did not timely conduct a status hearing, an initial permanency hearing, or subsequent permanency hearings, we believe the reasons for our holdings in *E.D.L.* and *T.T.F.* apply in this case.   Sections

---

[52]The State notes in its supplemental brief that the initial order naming the Department as the temporary managing conservator of J.G.K. was signed on March 6, 2008, and that the sixtieth day following that order would therefore have been May 5, 2008.  There was a status hearing on October 2, 2008, involving some of the children in Mother's care.  *See T.T.F.*, 331 S.W.3d at 478.  But the State concedes that there is no order relating to a status hearing in the record in the instant case and that such status hearing was untimely.

76

263.201 and 263.305 do not contain remedies for the failure to timely hold a status hearing or a subsequent permanency hearing, and section 263.304(b) specifically provides that any party to the suit may compel the trial court, by mandamus, to comply with its obligation to conduct an initial permanency hearing within the statutory deadline.  *See* Tex. Fam. Code Ann. §§ 263.301, .304(b), .305.  Thus, under the plain language of section 263.304(b) and the reasoning in *E.D.L.* and *T.T.F.*, Mother could have sought to enforce her procedural right to a timely status hearing, a timely initial permanency hearing, and timely subsequent permanency hearings by mandamus.  *See* Tex. Fam. Code Ann. § 263.304(b); *T.T.F.*, 331 S.W.3d at 479; *E.D.L.*, 105 S.W.3d at 688.  But Mother did not seek mandamus relief or otherwise complain to the trial court in a timely manner about its failure to conduct the hearings.[53]  *See In re N.V.D.*, 102 S.W.3d 268, 269–70 (Tex. App.—Beaumont 2003, pet. denied) (acknowledging trial court's failure to timely conduct a subsequent permanency hearing, noting that parent did not seek mandamus and that trial court conducted subsequent permanency hearing as soon as delay was brought to its attention, and holding that error was harmless because parent did not demonstrate that error probably caused rendition of an improper judgment).  Because Mother did not seek mandamus

---

[53]Mother first complained about the lack of a timely status hearing in her motion to dismiss, almost sixteen months after the statutory hearing date deadline had passed and after the trial court had held two permanency hearings in this case.  Thus, her complaint was not timely.

relief, she cannot complain on appeal that she was denied procedural due process in the trial court. *See id.*

Moreover, Mother has also failed to show that she was harmed by the trial court's failure to timely conduct the status hearing, the initial permanency hearing, or the subsequent permanency hearings. Indeed, she makes no argument at all concerning harm, and she makes no complaint concerning anything that occurred at the status hearing, the initial permanency hearing, or the subsequent permanency hearing. "[T]he remedy for a denial of due process is due process." *Univ. of Tex. Med. Sch. at Houston v. Than*, 901 S.W.2d 926, 933 (Tex. 1995) (citing *Perry v. Sindermann*, 408 U.S. 593, 603, 92 S. Ct. 2694, 2700–01 (1972)). Recalling that the trial court did, albeit in an untimely manner, conduct a status hearing, an initial permanency hearing, and a subsequent permanency hearing, we hold that Mother is not entitled to relief for the trial court's failure to timely conduct the hearings because Mother already received the process she was due. On these facts, we hold that the trial court did not violate Mother's procedural due process rights by failing to timely conduct the status hearing, the initial permanency hearing, or the subsequent permanency hearings. We overrule this part of Mother's first issue.

### E. Retention of Suit on Docket for Extraordinary Circumstances

Mother argues that her due process rights were violated because the trial court did not conduct a hearing before retaining the case on the docket beyond the initial one-year dismissal date.

78

The one-year dismissal date in this case was March 9, 2009. The Department filed a motion on March 4, 2009, requesting that the trial court retain the case on the trial court's docket and set a new dismissal date pursuant to family code section 263.401(b); the Department did not request a hearing on its motion. Mother did not file a response to the Department's motion, nor did she seek mandamus to compel the trial of her case before the statutory deadline. On March 5, 2009, without holding a hearing, the trial court issued an order retaining the suit on the docket, setting a new dismissal date of September 5, 2009, and setting the next permanency hearing for March 30, 2009. The trial court did not cite any specific extraordinary circumstances in its order, stating only "that extraordinary circumstances necessitate the child remaining in the temporary managing conservatorship of the Department and that continuing the appointment of the Department as temporary managing conservator is in the best interest of the child." Mother did not file a motion for reconsideration of the retention order, nor did she file any motion challenging the trial court's holding the permanency hearings on March 30, 2009, and July 20, 2009, or challenging the trial court's setting a trial date of September 3, 2009. Mother first protested the trial court's retention of the case on August 18, 2009, in her motion to dismiss.

We set forth the law in *T.T.F.* as follows,

In relevant part, family code section 263.401 states:

(a) Unless the court has commenced the trial on the merits or granted an extension under Subsection (b), on the first Monday after the first anniversary of the date the court rendered a temporary order appointing the department as temporary managing conservator, the court shall dismiss the suit affecting the parent-child relationship filed by the department that requests termination of the parent-child relationship or requests that the department be named conservator of the child.

(b) Unless the court has commenced the trial on the merits, the court may not retain the suit on the court's docket after the time described by Subsection (a) unless the court finds that extraordinary circumstances necessitate the child remaining in the temporary managing conservatorship of the department and that continuing the appointment of the department as temporary managing conservator is in the best interest of the child.

Tex. Family Code Ann. § 263.401(a), (b) (West 2008).

331 S.W.3d at 474–75.

We strictly construe statutes concerning involuntary termination of parental rights in favor of parents. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985); *In re A.V.*, 849 S.W.2d 393, 400 (Tex. App.—Fort Worth 1993, no writ). Our primary objective in construing a statute, however, is to determine and give effect to the legislature's intent. *Phillips v. Beaber*, 995 S.W.2d 655, 658 (Tex. 1999). In determining the legislature's intent, we look first to the statute's plain and common meaning and presume that the legislature intended the plain meaning of its words. *Fleming Foods of Tex., Inc. v. Rylander*, 6 S.W.3d 278, 282 (Tex. 1999). We also presume that the legislature chose its words carefully, recognizing that every word in a statute was included for some purpose and that every word excluded was omitted for a purpose. *In re M.J.M.L.*, 31 S.W.3d 347,

80

354 (Tex. App.—San Antonio 2000, pet. denied); *Renaissance Park v. Davila*, 27

S.W.3d 252, 257 (Tex. App.—Austin 2000, no pet.).

Mother argues that the trial court violated her procedural due process

rights by not conducting a hearing before granting an extension for extraordinary

circumstances, but the plain language of section 263.401 does not require the

trial court to conduct a hearing before granting an extension. *See* Tex. Fam.

Code Ann. § 263.401(a), (b). Thus, we must presume that the legislature did not

intend to require a hearing before the trial court retains a case on its docket

pursuant to section 263.401(b). *See id.* § 263.401(b); *M.J.M.L.*, 31 S.W.3d at

354; *Renaissance Park*, 27 S.W.3d at 256. Moreover, we note that this court has

previously held that section 263.401(b) does not require a written extension order

and that an oral rendition is sufficient. *See In re J.L.C.*, 194 S.W.3d 667, 672

(Tex. App.—Fort Worth 2006, no pet.). We therefore hold that the trial court did

not violate Mother's procedural due process rights by not conducting a hearing

before retaining the case on the docket beyond the one-year dismissal date. *See*

*T.T.F.*, 331 S.W.3d at 475. We overrule this part of Mother's first issue.

Mother also argues that the trial court denied her procedural due process

rights by retaining the case on the docket beyond the initial dismissal date

because extraordinary circumstances did not exist to justify retention. The trial

court noted in the order retaining the case that "extraordinary circumstances"

existed but did not elaborate on what constituted extraordinary circumstances in

this case.

81

"Because an extension of the dismissal date is similar to a continuance and because section 263.401(b) does not indicate which appellate standard of review to apply, we apply the abuse of discretion standard." *In re D.W.*, 249 S.W.3d 625, 647 (Tex. App.—Fort Worth 2008) (citing *In re J.A.*, No. 02-05-00454-CV, 2006 WL 3114434, at *9 (Tex. App.—Fort Worth 2006, no pet.) (mem. op.)), *pet. denied*, 260 S.W.3d 462 (Tex. 2008).

To determine whether a trial court abused its discretion, we must decide whether the trial court acted without reference to any guiding rules or principles; in other words, we must decide whether the act was arbitrary or unreasonable. *Low v. Henry*, 221 S.W.3d 609, 614 (Tex. 2007); *Cire v. Cummings*, 134 S.W.3d 835, 838–39 (Tex. 2004). An appellate court cannot conclude that a trial court abused its discretion merely because the appellate court would have ruled differently in the same circumstances. *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 558 (Tex. 1995); *see also Low*, 221 S.W.3d at 620.

Here, because the case was approaching the initial one-year dismissal date, the Department requested that the case be retained and that a new dismissal date be set. The Department stated in its motion for retention that extraordinary circumstances necessitated the children remaining in the temporary managing conservatorship of the Department, that the Department was requesting a jury trial, and that the trial court had previously ordered a monitored return situation with Mother and her newest child; Mother did not oppose the Department's motion. Mother now complains of the trial court's

82

failure to set forth the extraordinary circumstances that it relied on in retaining the case. But family code section 263.401 does not require the trial court to explain in the extension order what the extraordinary circumstances are that necessitate the extension. *In re A.T.S.*, No. 12-07-00196-CV, 2008 WL 2930392, at *18 (Tex. App.—Tyler July 31, 2008, no pet.) (mem. op.). Because no explanation for the extraordinary circumstances was required to be included in the extension order, Mother's due process rights were not denied by the trial court's failure to explain the extraordinary circumstances it found present here. Second, Mother does not argue that she was harmed by the trial court's retention of the case beyond the one-year dismissal date. Indeed, the delay permitted Mother to present evidence to the jury that she had maintained a home during the year preceding the trial, evidence that she could not have presented to the jury before the March 9, 2009 one-year dismissal date. *See Melton v. Tex. Dep't of Family & Protective Servs.*, No. 03-08-00168-CV, 2010 WL 668917, at *2 (Tex. App.—Austin Feb. 25, 2010, no pet.) (mem. op.) (holding that the appellant failed to establish harm from the trial court's failure to dismiss the suit within the one-year deadline). Thus, we hold that the trial court did not deny Mother due process by retaining the case on its docket beyond the initial one-year dismissal date. We overrule this portion of Mother's first issue.

### F. Cumulative Due Process Violation and Abuse of Discretion

In the final part of her first issue, Mother contends that each of the above failures by the trial court and the Department "individually and in sum" denied her

83

the "procedural guarantees of the Texas Family Code to such an extent that her due process rights were violated." Although we do not condone the trial court's and the Department's lack of diligence in this case, we have held that each of Mother's procedural due process arguments is without merit. Thus, we also hold that the trial court's and the Department's actions or inactions did not cumulatively violate Mother's procedural due process rights. In her second issue, Mother argues that the trial court abused its discretion in pretrial matters by denying the motion in which she raised her procedural due process complaints. Because we have held that the trial court did not deny Mother due process, we cannot say that the trial court abused its discretion by denying her pretrial motion raising due process complaints. *See T.T.F.*, 331 S.W.3d at 480. Accordingly, we overrule the remainder of Mother's first issue and all of her second issue.

## IV. LEGALLY AND FACTUALLY SUFFICIENT EVIDENCE OF CONDUCT AND ENVIRONMENTAL ENDANGERMENT TO SUPPORT TERMINATION ORDER

In her third issue, Mother argues that there is legally and factually insufficient evidence to establish the termination grounds under family code section 161.001(1)(D) and (E). Mother focuses her argument on two subissues: (1) her alleged failure to maintain stability and a clean and safe home environment for her children at the time of the removal and prior to the removal and (2) Dr. Hollis's failure-to-thrive diagnosis of T.Q.F.

84

## A. Burden of Proof and Standards of Review

A parent's rights to "the companionship, care, custody, and management" of her children are constitutional interests "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982); *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). "While parental rights are of constitutional magnitude, they are not absolute. Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right." *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002). In a termination case, the State seeks not just to limit parental rights but to erase them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit. *See Holick*, 685 S.W.2d at 20; Tex. Fam. Code Ann. § 161.206(b) (West 2008). We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent. *Holick*, 685 S.W.2d at 20–21; *In re R.R.*, 294 S.W.3d 213, 233 (Tex. App.—Fort Worth 2009, no pet.).

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one ground listed under subsection (1) of the statute and must also prove that termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001 (West Supp. 2010); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Both elements must be established; termination may not be based solely on the best interest of the child

85

as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987).

Termination decisions must be supported by clear and convincing evidence. Tex. Fam. Code Ann. § 161.001 (West 2008), § 161.206(a). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007 (West Supp. 2010). Due process demands this heightened standard because termination results in permanent, irrevocable changes for the parent and child. *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007) (contrasting standards for termination and modification).

In evaluating the evidence for legal sufficiency in parental termination cases, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the grounds for termination were proven. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We review all the evidence in the light most favorable to the finding and judgment. *Id.* We resolve any disputed facts in favor of the finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* We consider undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to termination if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *Id.*

We cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses, for that is the factfinder's province. *Id.* at 573, 574. And even when credibility issues appear in the appellate record, we defer to the factfinder's determinations as long as they are not unreasonable. *Id.* at 573.

In reviewing the evidence for factual sufficiency, we give due deference to the factfinder's findings and do not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that Mother violated section 161.001(1)(D) or (E) and that the termination of the parent-child relationship would be in the best interest of the child. Tex. Fam. Code Ann. § 161.001; *C.H.*, 89 S.W.3d at 28. If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

### B. Law on Endangerment

Endangerment means to expose to loss or injury, to jeopardize. *Boyd*, 727 S.W.2d at 533; *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.); *see also In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996). To prove endangerment under subsection (D), the Department had to prove that Mother knowingly placed or allowed J.G.K. to remain in conditions or surroundings that

87

endangered her physical or emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(1)(D); *In re J.A.J.*, 225 S.W.3d 621, 625 (Tex. App.—Houston [14th Dist.] 2006) (op. on reh'g), *judgm't aff'd in part, rev'd in part by* 243 S.W.3d 611 (Tex. 2007). Subsection (D) focuses on the suitability of the child's living conditions. *J.A.J.*, 225 S.W.3d at 626. Thus, under (D), it must be the environment itself that causes the child's physical or emotional well-being to be endangered, not the parent's conduct. *Id* at 627.

Under subsection (E), the relevant inquiry is whether evidence exists that the endangerment of the child's physical well-being was the direct result of Mother's conduct, including acts, omissions, or failures to act. *See J.T.G.*, 121 S.W.3d at 125; *see also* Tex. Fam. Code Ann. § 161.001(1)(E). Additionally, termination under (E) must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the parent. *J.T.G.*, 121 S.W.3d at 125; *see* Tex. Fam. Code Ann. § 161.001(1)(E). It is not necessary, however, that the parent's conduct be directed at the child or that the child actually suffer injury. *Boyd*, 727 S.W.2d at 533; *J.T.G.*, 121 S.W.3d at 125. The specific danger to the child's well-being may be inferred from parental misconduct standing alone. *Boyd*, 727 S.W.2d at 533; *In re R.W.*, 129 S.W.3d 732, 738 (Tex. App.—Fort Worth 2004, pet. denied). A parent's mental state may be considered in determining whether a child is endangered if that mental state allows the parent to engage in conduct that jeopardizes the physical or emotional well-being of the child. *In re J.I.T.P.*, 99 S.W.3d 841, 845 (Tex.

88

App.—Houston [14th Dist.] 2003, no pet.). As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being. *See In re S.D.*, 980 S.W.2d 758, 763 (Tex. App.—San Antonio 1998, pet. denied). To determine whether termination is necessary, courts may look to parental conduct occurring both before and after the child's birth. *In re D.M.*, 58 S.W.3d 801, 812 (Tex. App.—Fort Worth 2001, no pet.).

### C. Evidence Is Legally and Factually Sufficient to Support Termination Order

In determining whether the evidence is legally and factually sufficient to support termination of Mother's parental rights pursuant to (D) or (E), we look at whether Mother (1) knowingly placed or knowingly allowed J.G.K. to remain in conditions or surroundings that endangered her physical or emotional well-being or (2) engaged in conduct or knowingly placed J.G.K. with persons who engaged in conduct that endangered her physical or emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E). Although Mother focuses only on two types of acts or omissions, the Department's brief contains a combined legal and factual sufficiency analysis focusing on five types of acts or omissions by Mother that it contends support termination of Mother's rights under (D) and (E): that Mother's physical and medical neglect of her children was endangering; that Mother's instability and irresponsible choices were endangering to J.G.K.; that Mother endangered J.G.K. by exposing her to domestic violence and inappropriate

89

caregivers; that Mother's anger issues were endangering to J.G.K.; and that Mother's drug use was endangering to J.G.K. We will examine all of the evidence in the record, focusing on these allegations.

Mother did seek treatment for T.Q.F. when he had RSV and pneumonia, and she had no way to pay for the medications that he needed upon his discharge from the hospital because she had allowed his Medicaid to lapse. Thereafter, when the children were removed on March 5, 2008, the Department found that they were wearing the same clothes as the previous day and that the children were dirty and unbathed, though Mother disputed this. The record reflects that J.G.K. had two ringworms at the time of the removal and that Mother had failed to seek treatment for J.G.K. because Mother had allowed J.G.K.'s Medicaid to lapse. After the removal, T.Q.F.'s foster parents took him to a pediatrician, who diagnosed him as failure to thrive because he had fallen significantly on the growth chart. Although Mother tried to show that Dr. Hollis used the wrong growth chart because she did not use one for a premature infant, Dr. Hollis testified that such charts are used only for the first year, and T.Q.F. was more than a year old at the time he was seen by Dr. Hollis. Dr. Hollis further testified that T.Q.F.'s failure to thrive not only impacted his growth but also could impact his future intelligence. Mother admitted that she had failed to seek treatment for T.Q.F. even though she recognized that he was not growing and that he was not current on his vaccinations because she had let his Medicaid lapse. Moreover, the places that Mother chose for her family to live exhibited

90

unsafe living conditions for children—including boards with nails sticking out, rat feces on the walls, and a hole by the front door—and then Mother made the conditions worse by leaving out unsafe food and clutter. Mother admitted that her children were removed in March 2008 because she could not care for them. After the children were removed and she gave birth to G.J.M.-B., Mother purchased a car and drove G.J.M.-B. in the car even though Mother did not have a license. This is some evidence that Mother's conduct, including omissions, created an environment that endangered J.G.K.'s physical or emotional well-being. *See In re S.H.A.*, 728 S.W.2d 73, 87 (Tex. App.—Dallas 1987, writ ref'd n.r.e.) (holding that evidence that parents did not properly feed the child and did not seek appropriate medical treatment for the child was some evidence to support jury's findings that parents engaged in conduct which endangered child's physical or emotional well-being).

The record contains numerous examples of Mother's instability and irresponsible choices. As set forth above, Mother has worked only two days in her life and has depended on others to provide her and her children with basic necessities, including food and housing. As a result, Mother moved frequently as her relationships with her benefactors ebbed and flowed. During the time that Mother was moving back and forth between Dallas Street and Gerald Street, the two houses were not in the same school district, so J.K.P. was in constant transition, being moved back and forth between schools. Durham described the home environment as "chaotic," and the record reflects that Mother relied on the

Department to transport J.K.P. to school because Mother often failed to get J.K.P. to the bus, causing him to miss twenty days of school during the monitored return. Although Mother had been renting an apartment for almost a year at the time of the termination trial, the record revealed that an eviction proceeding was pending because Mother had been shorting her landlady for several months. Mother also disclosed that she had not been responsible in using the Social Security benefits and tax refunds that she had received; she had purchased a car that she could not afford and that she could not legally drive because she had no driver's license and no car insurance. Despite the lack of a driver's license and car insurance, Mother had driven her car and had received tickets, for which she was making monthly payments. Mother had also failed to use the checks that she had received to get unbarred at the Housing Authority, and Mother noted at trial that she could have used the checks to hire an attorney to expunge her criminal record so that she would be in a better position to apply for jobs and apartments. Mother spent more than she received each month and continually relied on help from the Department, CASA, the mission, and friends and relatives, all the while foregoing WIC. Moreover, Mother's budgets reflected that she did not understand how much more she would need if each of her children were returned to her. This is some evidence that Mother's conduct, including omissions, endangered J.G.K.'s physical or emotional well-being and that Mother exposed J.G.K. to an unstable environment that endangered J.G.K.'s physical or emotional well-being. *See In re T.C.*, No. 10-10-00207-CV, 2010 WL 4983512,

92

at *4–5 (Tex. App.—Waco Dec. 1, 2010, pet. denied) (mem. op.) (holding that although there were recent developments that showed improvements in mother's stability, the trial court could reasonably have determined that any evidence of improvement was short-lived and outweighed by the extent of her prior history; thus, the evidence supported that mother, by living in fifteen locations among other things, had engaged in conduct that endangered child's physical and emotional well-being).

Additionally, the record demonstrates that the children witnessed domestic violence and were subjected to inappropriate caregivers. Mother admitted that her children had been exposed to and witnessed acts of family violence. In 2005, Mother obtained a restraining order against T.M.J.'s father because he had beaten her (and she also admitted beating him); but prior to the trial, Mother had allowed him to spend the night in her home with G.J.M.-B. even though he was on probation for assault family violence. Mother also allowed her brother to stay in her home with G.J.M.-B., even though she had told her landlady that he had hit her in the face and had previously threatened her. Mother had agreed that people who assault family members were not appropriate people to have around children, but Mother had allowed such people around her children, including her own mother who had hit her in 2007 but whom Mother later relied on to help her with her children. In 2005, Mother left four of her children, including J.G.K., with a woman named Dorothy, whom she had known for only a day. Dorothy was mentally ill, and D.J.F. stopped breathing while he was in her care. The record

93

does not state why D.J.F. stopped breathing while she was in Dorothy's care, but D.J.F. was taken to the hospital, and CPS thereafter removed all four children. This is some evidence that Mother's conduct, as well as the conduct of those she exposed her children to, endangered J.G.K. *See In re M.R.*, 243 S.W.3d 807, 819 (Tex. App.—Fort Worth 2007, no pet.) (holding that evidence of exposing a child to domestic violence supports an endangerment finding).

Moreover, the record contains numerous instances where Mother could not control her anger. Mother had hung up on Johnson; had threatened to "whoop" Durham; had threatened to shoot when Durham arrived to remove the children; had yelled at Durham when Durham asked Mother not to yell at the children; had yelled at Carillo, Safe Harbor workers, and caseworkers; had yelled at J.G.K.'s foster mother; had been belligerent, rude, and pouty toward Reed; and had hung up on Reed. Mother became outraged when she saw a faint scratch on J.G.K.'s face at one visit and slammed and broke the door at the visitation center. These events occurred while Mother was on her bipolar medications, which she claimed were working. All of this is some evidence that Mother's conduct directed at others, both within the family and outside the family, created an environment that endangered J.G.K.'s emotional or physical well-being. *See Jordan v. Dossey*, 325 S.W.3d 700, 725 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) (holding that although there had been recent developments showing improvements in mother's condition, such evidence of improvement was short-lived and outweighed by the extent of her mental history

94

over the course of the case; thus, mother's conduct physically and emotionally endangered her son).

Furthermore, the record discloses that Mother used drugs and subjected the children to others who used drugs. Mother had fainted from using marijuana in 2002 and had tested positive for cocaine. Moreover, T.M.J.'s father, whom Mother allowed in her home, smoked marijuana and had been in a court-ordered drug rehabilitation program. This is some evidence that J.G.K.'s emotional or physical well-being was endangered. *See In re J.T.G.*, 121 S.W.3d at 125 (holding parents' and caregiver's illegal drug use supported a finding that the child's surroundings endangered her physical or emotional well-being).

Viewing all the evidence in the light most favorable to the termination judgment and disregarding all contrary evidence that a reasonable factfinder could disregard, we hold that some evidence exists that will support a factfinder's firm conviction or belief that Mother violated subsections (D) and (E). We thus hold that the evidence is legally sufficient to support termination of Mother's parental rights to J.G.K. under subsections (D) and (E). *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E); *R.W.*, 129 S.W.3d at 739–44 (holding evidence legally sufficient to support termination under (E) because father had a history of substance abuse, mental instability, and criminal history); *In re T.H.*, No. 02-07-00464-CV, 2008 WL 4831374, at *4–5 (Tex. App.—Fort Worth Nov. 6, 2008, no pet.) (mem. op.) (holding evidence legally sufficient to support trial court's 161.001(1)(D) and (E) findings because evidence showed that father had

95

engaged in conduct that subjected his children to a life of instability and uncertainty, including living at more than five residences over five years and living in residences that were "genuinely dirty" and in disarray; had used illegal drugs; had engaged in domestic violence; and had exhibited anger issues); *Sawyer v. Tex. Dep't of Protective & Regulatory Servs.*, No. 03-02-00286-CV, 2003 WL 549216, at *9 (Tex. App.—Austin Feb. 27, 2003, no pet.) (mem. op.) (holding that evidence was legally sufficient to support termination under (D) and (E) because mother had a history of mental illness, housing and financial instability, relationships with violent men, and drug use).

Moreover, viewing all of the evidence in a neutral light, the volume of evidence—set forth extensively above—that a reasonable factfinder could have credited in favor of subsections (D) and (E) findings is so significant that a factfinder could reasonably have formed a firm conviction or belief of the truth of the allegations that Mother had violated subsections (D) and (E). *See H.R.M.*, 209 S.W.3d at 108; *C.H.*, 89 S.W.3d at 28. We therefore hold that the evidence is factually sufficient to support termination of Mother's parental rights to J.G.K. under subsections (D) and (E). *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E); *R.W.*, 129 S.W.3d at 739–44 (holding evidence factually sufficient to support termination under (E) because father had a history of substance abuse, mental instability, and criminal history); *T.H.*, 2008 WL 4831374, at *4–5 (holding evidence factually sufficient to support trial court's 161.001(1)(D) and (E) findings); *In re E.W.A.*, No. 02-07-00135-CV, 2008 WL 1867144, at *10 (Tex.

96

App.—Fort Worth Apr. 24, 2008, no pet.) (mem. op.) (holding evidence factually sufficient to support trial court's findings under section 161.001(1)(D) and (E) because evidence showed that mother used illegal drugs, frequently changed residences without the Department's permission, and lived with a convicted felon); *In re S.A.*, No. 02-06-00253-CV, 2007 WL 1441014, at *10–11 (Tex. App.—Fort Worth May 17, 2007, no pet.) (mem. op.) (holding evidence factually sufficient to support termination under (D) and (E) because mother suffered from bipolar disorder; had a history of drug use, including during a pregnancy; had a pattern of uncontrolled anger; showed instability in her living arrangements; and had a criminal history); *Sawyer*, 2003 WL 549216, at *9 (holding evidence factually sufficient to support termination under (D) and (E)). We overrule Mother's third issue.

## V. TERMINATION WAS IN J.G.K.'S BEST INTEREST

In her fourth issue, Mother argues that the evidence is legally and factually insufficient to support the trial court's finding that termination of the parent-child relationship was in J.G.K.'s best interest. Specifically, Mother argues that it was not in J.G.K.'s best interest to terminate Mother's parental rights to J.G.K. because Mother was caring for G.J.M.-B. at the time of trial and because the evidence showed that Mother loved J.G.K.

There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). Prompt and permanent placement of the child in a safe environment is also presumed to be

in the child's best interest.  Tex. Fam. Code Ann. § 263.307(a) (West 2008).  The following factors should be considered in evaluating the parent's willingness and ability to provide the child with a safe environment:

(1) the child's age and physical and mental vulnerabilities;

(2) the frequency and nature of out-of-home placements;

(3) the magnitude, frequency, and circumstances of the harm to the child;

(4) whether the child has been the victim of repeated harm after the initial report and intervention by the department or other agency;

(5) whether the child is fearful of living in or returning to the child's home;

(6) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home;

(7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home;

(8) whether there is a history of substance abuse by the child's family or others who have access to the child's home;

(9) whether the perpetrator of the harm to the child is identified;

(10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision;

(11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time;

(12) whether the child's family demonstrates adequate parenting skills, including providing the child and other children under the family's care with:

(A) minimally adequate health and nutritional care;

(B) care, nurturance, and appropriate discipline consistent with the child's physical and psychological development;

(C) guidance and supervision consistent with the child's safety;

(D) a safe physical home environment;

(E) protection from repeated exposure to violence even though the violence may not be directed at the child; and

(F) an understanding of the child's needs and capabilities; and

(13) whether an adequate social support system consisting of an extended family and friends is available to the child.

*Id.* § 263.307(b); *R.R.*, 209 S.W.3d at 116.

Other, nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the child include (A) the desires of the child, (B) the emotional and physical needs of the child now and in the future, (C) the emotional and physical danger to the child now and in the future, (D) the parental abilities of the individuals seeking custody, (E) the programs available to assist these individuals to promote the best interest of the child, (F) the plans for the child by these individuals or by the agency seeking custody, (G) the stability of the home or proposed placement, (H) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one,

and (I) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).

These factors are not exhaustive; some listed factors may be inapplicable to some cases; other factors not on the list may also be considered when appropriate. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

In analyzing the section 263.307(b) factors, the record reveals that J.G.K. was seven at the time of trial and had no physical issues. Mother admitted that J.G.K. had been in foster care most of her life. The frequency and circumstances surrounding the harm caused to J.G.K. are detailed thoroughly above, including additional harm imposed on her by required visits with Mother during which Mother often yelled at those at the CPS visitation center. J.G.K. made it clear that she did not want to live with Mother because she was scared of Mother, who was loud and yelled a lot. Mother also moved frequently. Mother's psychological evaluation revealed that she suffered from depression and bipolar disorder and that she took medication, but the record also revealed that the medication did not subdue all of Mother's anger issues, as evidenced by Mother's yelling at various people involved in the case and her slamming and breaking the door at the CPS visitation center. Mother admitted that the children had witnessed domestic

100

violence in the home. The record demonstrated that Mother had overdosed on drugs and had allowed others, who were known to use drugs, into her home. Mother completed some of her services but relied heavily upon CPS, CASA, the mission, and friends and family to provide for her family's needs because Mother was irresponsible with her money. Additionally, Mother did not take advantage of WIC, job opportunities, and education opportunities that were offered to her, and she often "no-showed" for the appointments that were made for her. Although Mother testified that she wanted her children back, her actions demonstrated otherwise. Mother failed to demonstrate adequate parenting skills as shown by T.Q.F.'s failure-to-thrive diagnosis, J.G.K.'s untreated ringworms, and pictures of unsafe living conditions. Mother also chose an unsafe caregiver named Dorothy to look after her children and had allowed her mother to take care of her children even though her mother had assaulted Mother.

With regard to the *Holley* factors, the record reveals that although J.G.K. did not testify at trial, her wishes were relayed by others; J.G.K. did not want to visit with her Mother, nor did she want to live with her. J.G.K. had the same physical and emotional needs as any other child, which would include a stable living environment. The present and future emotional and physical danger to J.G.K. stemmed from the fact that J.G.K. had spent most of her life in foster care, not with Mother, so moving in with Mother would be emotionally detrimental to J.G.K., would wipe out the progress she had made, and would cause her to "revert substantially," according to Reed. Although Mother had completed

101

parenting classes, she had not proven her ability to support her children without major intervention by numerous organizations and individuals. Mother had used so much help from CASA that Reed was no longer allowed to provide concrete services to Mother, yet Mother did not take full advantage of all the government programs that were offered to assist her. Mother wanted J.G.K. to live with her, but Mother had not decided where she would live, had not checked into where J.G.K. would attend school, and had not confirmed whether the mission would provide all the clothes and necessities that she expected to obtain from them. The Department's plan was to allow the foster mother to adopt J.G.K. if Mother's parental rights were terminated, and the record revealed that the foster mother could provide for J.G.K., even though Mother did not think it was a loving, stable, safe environment. Johnson did not dispute Mother's testimony that G.J.M.-B. was doing well, but the fact that Mother was doing well with G.J.M.-B. did not change the Department's opinion of Mother's parenting abilities regarding J.G.K. Reed also did not dispute that Mother loved her children, but Reed had sat through all the previous trials and had not heard anything that made her believe that Mother had truly changed. During the two years that Johnson worked the case, she never heard Mother accept responsibility.

Considering the relevant statutory factors in evaluating Mother's willingness and ability to provide J.G.K. with a safe environment and the *Holley* factors, we hold that the evidence is both legally and factually sufficient to support the trial court's finding that termination of Mother's parental rights to

102

J.G.K. is in her best interest.  *See* Tex. Fam. Code Ann. § 161.001(2); *Jordan*, 325 S.W.3d at 733 (holding evidence legally and factually sufficient to support the trial court's finding that termination of mother's parental rights was in child's best interest when most of the best interest factors weighed in favor of termination); *T.H.*, 2008 WL 4831374, at *6–7 (holding evidence legally and factually sufficient to support best interest finding based on evidence of parent's substance abuse, domestic violence, anger management issues, multiple residences, and inability to provide a safe and healthy environment for children); *E.W.A.*, 2008 WL 1867144, at *12–13 (holding evidence factually sufficient to support best interest finding based on analysis of *Holley* factors and evidence that there was a history of domestic violence, drug use, and domestic instability); *Sawyer*, 2003 WL 549216, at *10–11 (holding evidence legally and factually sufficient to support best interest finding because mother's history of homelessness, unemployment, drug use, and relationships with violent men did not provide assurance of stability and permanence).  We therefore overrule Mother's fourth issue.

## VI. Conclusion

Having overruled each of Mother's four issues, including her subissues, we affirm the trial court's judgment terminating Mother's parental rights to J.G.K.


SUE WALKER
JUSTICE

PANEL:  GARDNER, WALKER, and MCCOY, JJ.

DELIVERED:  June 23, 2011